STATE *(ex rel. Pearson)* v. HAYES.

The legal construction of a statute is the ascertainment of the intention
    of the legislature. In one sense, their intention is a matter of law : it
    is a question for the court. In another sense, it is a matter of fact : it
    is to be determined by the natural weight of competent evidence.

The principle of local government authorizes the grant of limited powers
    of local legislation to municipalities ; but the power of general state
    legislation cannot be delegated by the senate and house of representa-
    tives, in whom it is vested by the constitution.

The provision of c. 54, Laws of 1879, that "the sense of the voters of
    this state shall be taken upon section one of this act, by ballot, those
    in favor thereof voting 'yes,' and those opposed voting 'no'; . . .
    and the governor shall . . . make proclamation of the result of
    said vote ; and if it shall appear that a majority of the voters voting
    upon said proposition voted in favor thereof, then section one of this
    act shall go into effect and become a law . . . and otherwise
    shall be of no effect," was intended to be a delegation of legislative
    power.

QUO WARRANTO, to test the validity of the election of the
defendant as one of the directors of the Concord Railroad Corpora-
tion, at the annual meeting of the stockholders, May 23, 1881.
Facts found by a referee. At the June session of the legislature,
1879, an act was passed providing that "In all elections for direct-
ors or managers of a corporation, each member or shareholder may
cast the whole number of his votes for one candidate, or distribute
them upon two or more candidates, as he may prefer." It was
further provided that the sense of the voters of the state should be
taken, at the biennial election to be holden in the November fol-
lowing, upon the foregoing proposition ; and that the same should
or should not go into effect and become a law, according to the
result of such popular vote. The returns of the vote showed a
majority in favor of the proposition : whereupon the governor, in
pursuance of a requirement of the act, issued his proclamation
stating the result of the vote, and declaring that section one of the

act, quoted above, would go into effect and become a law January 15, 1881.  The governor's proclamation, which recites the act in full, is given in the margin.*

At the annual meeting, held May 23, 1881, a resolution was passed to vote for seven directors for the ensuing year upon one ballot; and a committee was appointed to receive, sort, and count the votes, who, after the vote had been taken, reported the whole

---

### *STATE OF NEW HAMPSHIRE.

#### EXECUTIVE DEPARTMENT.

Whereas, on the nineteenth day of July, 1879, was approved the following Act, "An Act to provide for Minority Representation in Corporations":

*Be it enacted by the Senate and House of Representatives in General Court convened:*

SECT. 1.  In all elections for directors or managers of a corporation, each member or shareholder may cast the whole number of his votes for one candidate, or distribute them upon two or more candidates, as he may prefer.

SECT. 2.  At the biennial election to be holden in November, 1880, the sense of the voters of this state shall be taken upon section one of this act by ballot, those in favor thereof voting "yes," and those opposed voting "no;" and it is hereby made the duty of the selectmen in the several towns and wards in the state to insert in their warrants, for the meetings then to be holden, an article for this purpose.

SECT. 3.  Said ballots shall be assorted, counted, and declared in open meeting, and the clerks of the several towns and wards shall make a true record thereof, showing the number of ballots upon each side of the question, and shall, on or before the fifteenth day of December, 1880, return to the secretary of state a true copy of said record.

SECT. 4.  The secretary of state shall make a record of the returns so made to him, and lay the same before the governor on or before the first day of January, 1881; and the governor shall, on or before the fifteenth day of January, 1881, make proclamation of the result of said vote; and if it shall appear that a majority of the voters voting upon said proposition voted in favor thereof, then section one of this act shall go into effect and become a law from and after said fifteenth day of January, 1881; and otherwise shall be of no effect.

SECT. 5.  This act, excepting section one, shall take effect upon its passage, and section one as aforesaid.

Approved July 19, 1879.

*Now, therefore, Be it Known:* That I, Natt Head, governor of the state of New Hampshire, in obedience to the requirements of said section four, do hereby make proclamation of the result of the vote upon the question of the adoption of section one of said act, as returned to and recorded in the office of the secretary of state, as follows:

The whole number of tickets given in was 32,935, upon which there were 22,560 affirmative votes, and 10,375 negative votes; and, it appearing that a majority of the voters voting upon said proposition voted in favor thereof, the said section one will go into effect and become a law on and after the fifteenth day of January instant.

Given under my hand and the seal of the state, at Concord, this eighth day of January, in the year of our Lord one thousand eight hundred [SEAL.] and eighty-one, and of the adoption of the constitution the ninety-seventh.

                                        NATT HEAD, *Governor.*

By the Governor:

    A. B. THOMPSON, *Secretary of State.*

number of votes 23,095. Of these, six of the seven persons whose
names were upon the same ballot received 18,088 votes each, and
the defendant received 17,981. Votes upon 5,114 shares were
given in upon ballots which contained no name but that of the
relator; and the number of shares voted upon each of those ballots
was thereon multiplied by seven. If those products should be
counted as votes for the relator, he received 35,798. But the com-
mittee counted only the number of shares voted for the relator,
and reported that the relator received 5,114 votes. The seven
gentlemen who received the largest number of votes counted as
above, having received more than the number necessary for a
choice, were thereupon declared elected, and the record was so
made up.

The relator was present at the meeting, but made no address or
remarks, either to the committee or to the chair, in the nature of
suggestion, protest, or otherwise. Upon motion of Mr. Lyford, it
was voted that a record be kept of every vote cast, for whom, by
whom, and the number of shares for directors, at this meeting.
While the vote was being taken, Mr. L. D. Stevens asked the
chairman how the votes for Mr. Pearson were cast, one or seven
for every share. The chairman replied in substance, that the votes
had been cast, and the record would be made. Mr. W. J. Copeland
made a similar inquiry, asking if he or they were to understand
that the minority representation law had been disregarded. The
chairman answered that it had not, and that the records of the
vote would be made. Mr. Copeland further inquired if seven votes
had been cast for Mr. Pearson on every share of stock that was
voted for him, to which question there was no answer made. It
appeared from Mr. Lyford's testimony, that he (Lyford) supposed
he was acting as attorney for Mr. Pearson, and also supposed Mr.
Copeland and Mr. Burke were similarly employed as counsel.
Mr. Copeland voted at the meeting as proxy, and Mr. Stevens was
a stockholder. Neither gentleman stated that in the inquiries
made he was acting as counsel.

*Bingham & Mitchell*, for the plaintiff. In this case, we contend
that there is—after eliminating from it all questions which are
irrelevant and immaterial to the real issue—but a single question,
viz., Does the defendant legally hold a directorship in the Concord
Railroad Corporation : was he legally elected ? In other words,
Did John H. Pearson receive, at the meeting of the corporation on
May 23, 1881, a sufficient number of votes to elect him director ?
If Mr. Pearson received a sufficient number to elect him a director,
then the defendant did not get the requisite number of votes for
an election, and should not have been declared elected. The
shares of stock voted on and the votes cast respectively for Mr.
Pearson and the defendant stand thus : There were 5,114 shares
voted on for Mr. Pearson, and for him only. There were 17,981

shares voted on for seven candidates for directors, giving one vote for each of the seven candidates, and the defendant was one of the seven. The voters upon the 5,114 shares, instead of casting on each share one vote for each of seven candidates, cast on each share seven votes for one candidate. This made 35,798 votes cast for Mr. Pearson on the 5,114 shares; and 35,798 votes being a majority of the votes cast for the candidates for the directorship in controversy, Mr. Pearson was elected to it, and the defendant was illegally declared elected. The persons who voted upon the 5,114 shares, and cast 35,798 votes for the relator, cumulated their votes in accordance with the provisions of the following act of the legislature: "In all elections for directors or managers of a corporation, each member or shareholder may cast the whole number of his votes for one candidate, or distribute them upon two or more candidates, as he may prefer." Laws of 1879, *c.* 54, *s.* 1.

*W. P. Wilson* (of Massachusetts), for the defendant. The respondent denies that the relator was entitled to have the 5,114 votes cast for him multiplied by the number of directors to be chosen, because he contends,—

1. That the statute was unconstitutional, inasmuch as it was not a direct legislative enactment, but was an attempted delegation of legislative authority.

2. That the statute, if constitutional, did not confer the power contended for by the relator.

The principle contended for by the respondent, namely, that since the supreme legislative power is vested in the general court of New Hampshire (Const. N. H. II., *ss.* 2, 3) it cannot be delegated to others, is well recognized in all the adjudications. *Thorne* v. *Cramer*, 15 Barb. 112; Cooley Const. Lim. (4th ed.) 141; Sedgwick Const. Law 164; *Seneca Bank* v. *Lamb*, 26 Barb. 595. All authority is inherent in the people, and they are the original sovereigns. But when they invest a given body or person with any portion of this supreme authority, as, for instance, with the authority to make laws, or with the executive, administrative, or judicial authority, they divest themselves of such power, and they cannot resume it unless the power of resumption be expressly reserved in the constatory instrument. *State* v. *Morris Co.*, 7 Vroom 72. Nor can such power be delegated by such bodies or persons to others, since the maxim, *delegata potestas non potest delegari*, applies equally to the delegation of public and private authority. And upon another ground it seems that the legislative body cannot delegate this authority, since the people depend not only upon their legislators to pass and engross laws, but also upon their integrity, knowledge, and judgment; and it is for the legislators to decide upon the expediency as well as forms of the law, *i. e.*, it is a discretionary trust, so that, if the delegation of a discretionary private trust be void, *a fortiori* should it be so in the case of a public

trust. Could the legislature delegate this authority, it would avoid all responsibility for its acts, and it would be able to invest a person or body with the entire legislative power (*State* v. *Field*, 17 Mo. 529); and the object of the people in creating a legislature would be entirely frustrated, as it would cease to be a representative body, and would become a mere proposer of laws for the consideration and final action of some third person or body. And this result is not an imaginary evil, since it actually occurred in Indiana, and the people were compelled to provide, by constitutional amendment, that no law should be passed, the taking effect of which should be made to depend upon any authority except as provided in the constitution. *Maize* v. *State*, 4 Ind. 342.

Moreover, as an act can be repealed only by the power creating it, one legislature would be able to encroach upon the privileges and limit the authority of all succeeding legislatures. *Santo* v. *State*, 2 Iowa 165. But an act is unconstitutional which limits the authority of any subsequent legislature. *Philadelphia* v. *Fox*, 64 Penn. St. 169.

It may be contended, however, that to allow the people to decide whether a proposed enactment shall or shall not become a law is in accord with the principles of our democratic government, and is the method frequently adopted in submitting constitutional amendments to the people. In reply, it may be said that our democracy is not a pure democracy, like the government of Athens, but is a representative democracy; and, secondly, that the legislatures have no inherent power to frame a constitutional provision and leave it to the people for confirmation;—so that, if a legislature should do this, and the provision should be accepted, it derives its authority not from the legislature, but from the people. *Opinion of the Justices*, 6 Cush. 573. Therefore, if this principle be accepted, the people could enact all laws, and become the legislative power in direct violation of the constitution. Although all courts have recognized the principle that a legislature should not delegate its authority to enact laws, the difficulty has heretofore been the application of the maxim to the facts of the particular case. But it is contended that in this case no such difficulty can arise, since in the bill now before the court we have as plain an illustration of an attempt by a legislature to delegate its authority as can be desired.

That the legislature can enact a law which is to take effect upon a contingency cannot be doubted; and the rule as to such a contingency is succinctly stated in *State* v. *Parker*, 26 Vt. 357. The right, however, to enact a law subject to a contingency is altogether different from the right to delegate authority to make laws. The cases upon this subject seem to divide themselves into three distinct groups:

1. Those statutes to take effect upon a strict contingency as to time or event. *Brig Aurora* v. *U. S.*, 7 Cranch 382.

2. Those statutes which confer an authority or discretion as to their acceptance or execution. *Railroad Co.* v. *Com.*, 1 Ohio St. 77.

3. Those statutes which are truly a delegation of power to make a law. *State* v. *Field*, 17 Mo. 529.

There are but few adjudications upon cases of the first class, but they are best illustrated by the enactments of congress in which a law is made to take effect or to cease upon the happening of some event or act of some government. *Brig Aurora* v. *U. S.*, 7 Cranch 382. These enactments are sometimes cited as recognizing the validity of a delegation of legislative authority (*State* v. *Parker, supra*); but they are enacted under the provision of the constitution whereby congress is authorized "to regulate commerce with foreign nations," so that, although they might be considered as containing a delegation of authority in some instances, yet they are enacted in pursuance to direct constitutional provision, and are sustainable upon this ground if upon no other.

The second class consists of those statutes which confer authority or discretion as to their acceptance or execution, and include,—

*a.* Those statutes which contain a grant of property or privileges conditional upon acceptance: 1. Private charter; 2. Municipal legislation.

*b.* Those statutes creating "local option" laws, *e. g.*, laws by which the sale of intoxicating liquor is made to depend upon the votes of the inhabitants.

*a.* Statutes of this kind are not regarded as being a delegation of the authority to make laws, since they do not derive their force or validity from the legislative power; *i. e.*, they are not, strictly speaking, laws. It does not follow, that because the legislature enacts them therefore they are laws, since all acts of the legislature are not legislative acts;—for instance, the power to levy a tax, to create corporations, to coin money, to take land by right of eminent domain, or to declare war, although exercised by the legislature, is not a legislative, but a sovereign, power; *i. e.*, these acts are performed by virtue of the sovereign power inherent in the legislature. So, too, statutes regulating municipalities are not legislative acts, but acts of sovereignty. *Chandler* v. *Boston*, 112 Mass. 200; *Stone* v. *Charlestown*, 114 Mass. 214; *Com.* v. *Quarter Sessions*, 8 Penn. St. 391. The main difference between the case of a grant to a private corporation and of one to a municipal corporation is, that in the former instance the privileges and obligations bestowed must be accepted by the corporators before they can be concluded by such grant; whereas, in the case of municipal corporations, no assent or acceptance is necessary, from the very nature of the case, to conclude the citizens, since it is an inherent attribute of the legislature to control territorial divisions of the state, and to erect, change, divide, and even abolish such municipalities as may seem best for the government of the state. There-

fore the legislature can change the territorial limits of such munici-
palities, and can limit or extend the power of taxation, the creation
of debt, the establishment of highways and school-districts, and
all local regulations, including the power to make by-laws and
ordinances, without the consent of the inhabitants. *Berlin* v. *Gor-
ham*, 34 N. H. 266. The fact that an acceptance or assent, to be
indicated by the votes of the electors, is required, in no wise inval-
idates the exercise of such power, as such assent is given *qua* cor-
porators, not *qua* legislators. *Paterson* v. *Society*, 4 Zabr. 385.
The assent is of the same nature as the grant, whether it be of a
privilege conferred or obligation imposed. *Railroad Co.* v. *Com'rs*,
1 Ohio St. 77; *State* v. *Wilcox*, 45 Mo. 458; *Bull* v. *Read*, 13 Grat.
78; *State* v. *Scott*, 17 Mo. 521; *Peck* v. *Weddell*, 17 Ohio St. 271;
*Paterson* v. *Society, supra; Cheaney* v. *Hooser*, 9 B. Mon. 339; *Ber-
lin* v. *Gorham, supra; Alcorn* v. *Hamer*, 38 Miss. 652; *Corning* v.
*Greene*, 23 Barb. 33; *Morford* v. *Unger*, 8 Iowa 82; *Gorham* v.
*Springfield*, 21 Me. 58; *Com.* v. *Quarter Sessions, supra; Com.* v.
*Painter*, 10 Penn. St. 214; *Hobart* v. *Supervisors*, 17 Cal. 23; *Bank
of Chenango* v. *Brown*, 26 N. Y. 467; *Smith* v. *Mc Carthy*, 56 Penn.
St. 359; *R. R. Co.* v. *Geiger*, 34 Ind. 185; *State* v. *Linn Co.*, 44
Mo. 504; *Chandler* v. *Boston*, 112 Mass. 200; *Minot* v. *W. Roxbury*,
112 Mass. 1; *Stone* v. *Charlestown, supra; State* v. *Noyes*, 30 N.
H. 279; *People* v. *Reynolds*, 5 Gilm. 1; *Hudson Co.* v. *State*, 4
Zabr. 718; *People* v. *Nally*, 49 Cal. 478.

*b.* Those statutes creating local option laws. The cases under
this class are numerous and conflicting, and have generally arisen
when an attempt has been made to pass a general license law,
allowing the electors in the several counties or towns, however, to
adopt or reject it as they see fit. The question which is generally
left to the people by these laws is, whether liquor shall or shall
not be sold subject to license. The decisions have usually been
made to turn upon the phraseology of the bill; and those statutes
which have expressly declared that no liquor shall be sold without
license, but have allowed the electors to determine from time to
time whether licenses should be granted, have been sustained, it
being said in such cases that the statute created the vote, not the
vote the statute, since the statute was complete, as a law, before
reference to the people. *State* v. *Morris Co.*, 7 Vroom 72; *Santo*
v. *State*, 2 Iowa 165; *People* v. *Collins*, 3 Mich. 343; *State* v. *Cope-
land*, 3 R. I. 33; *Locke's App.*, 72 Penn. St. 491; *State* v. *Wilcox*,
42 Conn. 364. Those statutes, however, which in substance have
submitted to the electors the general question whether the sale of
intoxicating liquors should be licensed or not, have been considered
unconstitutional. *Rice* v. *Foster*, 4 Harr. (Del.) 479; *Maize* v. *State,
supra; Meshmeier* v. *State*, 11 Ind. 482; *Parker* v. *Com.*, 6 Penn.
St. 507; *Ex parte Wall*, 48 Cal. 279. And those statutes which
have allowed the people to decide whether the act prohibiting the
sale should or should not become a law, or whether they would

accept or act under such statute, have likewise been considered unconstitutional. *Thorne* v. *Cramer*, *supra; People* v. *Stout*, 23 Barb. 349; *Barto* v. *Himrod*, 8 N. Y. 483; *Geebrick* v. *State*, 5 Iowa 491. But in the late cases the question of constitutionality or unconstitutionality is not made to depend upon the phraseology of the statutes; but it is held, that although the power which the municipalities have to regulate the sale of intoxicating liquors (in the municipalities) is not embraced within the ordinary power to make by-laws and ordinances, it falls within the class of police regulations; and as these regulations may be entrusted by the legislature to such municipal authority by express enactment, they may likewise be entrusted by a general enactment. *Com.* v. *Bennett,* 108 Mass. 27; *Com.* v. *Dean,* 110 Mass. 357; *State* v. *Morris, supra; Gloversville* v. *Howell,* 70 N. Y. 287; *State* v. *Noyes,* 30 N. H. 279.

But whether "local option" laws are to be considered as constitutional in all cases, as deriving their authority from the sovereign power, or whether their constitutionality is to depend upon their phraseology, is not material to the construction of the statute before the court in the present instance: it is sufficient that they establish no rule which affects our case.

The third class consists of those statutes which contain a delegation of the legislative power. There are but few adjudications upon statutes of this nature; but it has been universally conceded that a statute of this nature would be unconstitutional. *Santo* v. *State, supra; Geebrick* v. *State, supra; State* v. *Beneke,* 9 Iowa 203; *Rice* v. *Foster, supra; Railroad Co.* v. *Com'rs, supra; Parker* v. *Com., supra; Maize* v. *State, supra; Meshmeier* v. *State, supra; State* v. *Swisher,* 17 Tex. 441; *State* v. *Copeland, supra; Paterson* v. *Society, supra; Alcorn* v. *Hamer, supra.* A statute allowing the people to decide by their votes whether it should become a law or not, has been held unconstitutional. *Thorne* v. *Cramer, supra; Bradley* v. *Baxter,* 15 Barb. 122; *People* v. *Stout, supra; Barto* v. *Himrod, supra.* A statute concerning roads and highways, certain sections of which imposed penalties and provided for their recovery by indictment, by which county courts were allowed, in their discretion, to suspend for any specified length of time the operation of the same, has likewise been held unconstitutional. *Gamble,* J., in delivering the opinion of the court, said,—"This act, by its own provisions, repeals the inconsistent provisions of a former act, and yet it is left to the county court to say which act shall be in force in their county. The question which is to be passed upon by the county court is, whether the new act shall be suspended and the old act revived, and if so, for how long. This bears a very strong resemblance to the exercise of legislative power by the county court." *State* v. *Field, supra.*

It is contended that the statute now before the court for construction is likewise a delegation of legislative authority, and therefore unconstitutional. This statute is entitled "An act to provide

for minority representation in corporations." [Counsel here quoted the statute.] It will not be questioned, I think, that the general court, in framing these provisions, did so by virtue of its legislative and not its sovereign power, since it was the establishment of a rule, and was not in any sense a grant. It was a rule regulating the manner of voting, and is similar to a statute regulating the transfer of stock in corporations. Compare Mass. Sts., 1881, *c.* 302. Could the general court, then, in the exercise of its legislative power, submit a bill of this nature to the people in order to ascertain their " sense" concerning it? There can be no difference between this method of submitting a bill to the people, and allowing them in express terms to decide whether the bill shall or shall not become a law, or whether they will or will not be bound thereby. The form of submission is immaterial. If their " sense" is averse to the bill, it will not become a law.

If it is said that the contingency upon which this statute is to take effect is of the same nature as the contingency upon which the acts of congress, already noticed, are made to depend, it may be said (in addition to the distinction heretofore suggested),—first, that congress does not make the efficacy of the latter statutes depend upon the act of its constituency, but of a hostile power; *i. e.*, congress does not make the efficacy of these enactments depend upon the act of the persons from whom it derives its authority, but upon the act of a power over which it has no control: such statutes do not act so much upon its constituency as against such hostile power;—secondly, that there is no question of discretion or will conferred thereby; therefore the contingency, though an act, is still an event: authority cannot be delegated to an event. Had the minority law been made to take effect, provided a general railroad law should at some future time be enacted, or the Lake Shore Railroad obtain a charter, such a contingency would have been lawful, it being in the nature of an event. But the gist of the contingency in the present case is not the event, but it is the sense or the will of the people as expressed by the event; and it is pernicious because it allows the constituency, in their discretion, to say what shall or what shall not be the law. When the contingency is a pure event, the law is complete when passed; the enacting body has expressed its judgment as to the expediency and the form of the law, and no other person has any discretion in the matter. In the statute now before the court it is evident that the general court did not exercise its discretion as to the expediency of this law; that it evaded the very responsibility, and failed to perform the very trusts, for which it had been constituted; that, when this bill left its hands, it was not a mandate, and had no vital force, but depended upon the will of the people to give it life. The vote created the law, therefore the vote was essentially an act of legislation. But as the people have no legislative power except it be derived from the general court, and as the general

court could not delegate its legislative authority, such act is of no effect, and is unconstitutional.

But though this statute is constitutional, it does not confer the privilege claimed by the relator. Judging from the ballots cast, the stockholders voting for the relator claimed the right to multiply the number of shares they owned by the number of directors to be elected. It is quite evident, however, that the minority law does not confer this right, as it makes no mention of a multiplier or multiplicand, and it does not, in terms, increase the number of votes a stockholder may cast. Furthermore, it simply authorizes a stockholder to cumulate the whole number of his votes; but since it wholly fails to state what "the whole number of his votes" is, this "number" must be determined by the law in force when this enactment became a law. By the General Laws of New Hampshire, c. 148, s. 18, in force January 15, 1881, being a reënactment of s. 5, c. 321, of the acts of the year 1846, it is provided,—"Every stockholder in any corporation, except banks whose charters otherwise provide, may give one vote at any meeting thereof for every share he owns therein, not exceeding one eighth part of the whole number of shares." Therefore one vote is the "whole number of his votes." Since this statute is an abrogation of the implied, but essential, stipulation in every compact of association, that the will of the majority shall be considered the will of the entire body (Angell & Ames Corp., s. 499, Dudley v. Kentucky High School, 9 Bush. (Ky.) 576) it must be construed strictly; that is to say, the intention of the legislators must not be extended by construction, and they may be presumed to have conferred only those rights which are given in express terms. "Cumulate," therefore, will not be interpreted by the court as "multiply."

In Missouri and Illinois the minority law expressly provides that in all elections for directors of any incorporated company each shareholder shall have the right to cast as many votes in the aggregate as shall equal the number of shares of stock so held by him multiplied by the number of directors to be elected, and may cast the whole number of votes, either in person or by proxy, for one candidate, or distribute them among two or more candidates. It likewise provides that such directors shall not be elected in any other manner. Rev. Sts. Mo., c. 21, s. 712; Rev. Sts. Ill. (1880), c. 114, s. 26. And in Pennsylvania it is provided,—"In all elections for directors of any corporation, each stockholder may cast the whole number of his votes for one candidate, or distribute them upon two or more candidates, as he may prefer; that is to say, if the said stockholder owns one share of stock, or has one vote, and is entitled to one vote for each of six directors, by virtue thereof he may give one vote to each of said six directors, or six votes for any one thereof, or a less number of votes for a less number of directors, and in this manner may distribute or cumulate his votes as he may see fit." Purdon's Laws of Penn., 1874, Corp.,

ss. 5, 22. By these statutes a stockholder is expressly given the right to multiply his single vote by the number of directors to be elected, or he is empowered to cumulate his votes in those cases where he is entitled to one vote for each of the directors to be elected; but by the New Hampshire statute an increase of votes is not given. It may be conceded that if a stockholder was entitled to more than one vote he could then cumulate these votes; but being entitled to one vote only, he cannot cumulate *it*. He may, however, avail himself of the benefit of the statute in another manner: being entitled to one vote for seven directors, he may cast this one vote for one director, or for two or more, as he prefers, by "scratching" as many candidates upon the majority ballot as are not acceptable to him, or he may cast his one vote for any other candidate.

If, however, by any ingenious argument, it is demonstrated that under the General Laws of New Hampshire a stockholder is entitled to more than one vote, as, for instance, one vote for each of seven directors, it remains to inquire into the nature and extent of the rights conferred by the statute of 1879. This act is neither restrictive nor directory, since it does not limit this right of cumulative voting to the minority *qua* minority, nor does it forbid the election of directors in any other than in the manner indicated. On the contrary, it is general and permissive, since it confers this right equally upon all stockholders, and allows them to exercise it or not, as they wish. The stockholders, therefore, may determine whether they will cast their votes cumulatively or not, since the manner of election, the forms of ballot, and all matters thereto pertaining, in the absence of any limitation in the charter, or of any statutory provision to the contrary, may be regulated by the stockholders. 2 Kent Com. 295; *Com.* v. *Woelper*, 3 S. & R. 29. For instance, assuming that the stockholders had, and always have had, the right to cast one vote for each of the seven directors to be chosen, yet it is clearly within the power of the stockholders to determine whether each director shall be voted for upon a separate ballot, or whether all the directors shall be voted for by one ballot at one time. Likewise, where the general power to vote by proxy is vested in corporations, the members may decide whether or not voting by proxy shall be exercised. Upon the same principle the stockholders can regulate the manner of voting cumulatively; and this they can do by an express resolve that no votes shall be cast or counted cumulatively, or by a resolve that the directors be balloted for separately and at different times; and the result of the first method would be that no stockholder could cast his votes or have them counted cumulatively, while the result of the second method would be that all stockholders alike could cast their votes and have them counted cumulatively; and in the latter case the increased votes of the minority would be offset by a like increase in the vote of the majority. Therefore the respondent contends that the stockholders who voted for the relator were

bound by the resolve that "the corporation proceed to vote for seven directors upon one ballot at one time," because that resolve controlled and established the manner of election. If, however, the minority were not concluded by that resolve *qua* resolve, still they have estopped themselves from exercising the right claimed. This right, as we have seen, is not an absolute right, but a permissive right,—one which can be exercised or not, as a stockholder sees fit. Therefore, if the stockholders who voted for the relator had intended to exercise this right, they should have claimed it, and protested against the proposed resolve. But it does not appear from the facts, as found by the referee, that the minority objected in the least to this resolve; on the contrary, they may have voted for it, thereby inducing the majority to cast their ballots in accordance with the resolve, and causing them to lose the right to have their ballots counted cumulatively. By their actions the minority caused the majority to believe that they (the minority) would not exercise this right, consequently they were estopped from subsequently asserting it.

If, however, the minority are not bound by the resolve, nor estopped by their conduct, from asserting the right to have their votes counted cumulatively, still the respondent is entitled to exercise the duties of a director of the Concord Railroad by virtue of the election next preceding the last annual meeting. For, if the respondent was not elected at the last annual meeting, neither were the other six candidates who were balloted for at the same time upon the same ballot; for the court will take judicial notice that there is the same defect in the title of all the candidates declared elected. If the respondent was not elected, it must be because he did not receive a majority of the votes cast; and if he did not, this must equally be true of all the other candidates who were voted for upon the same ticket. This court, therefore, cannot find that the respondent was not elected, unless it finds that none of the acting directors were elected. Since, therefore, the stockholders have failed to elect seven directors, as directed by their charter, the court will order another election; but in no event will it simply unseat the respondent. It will not select any one of the acting directors and oust him in order to supply his place subsequently with another person, even though such person received a majority of the votes cast, for that would be to permit the latter person to occupy the anomalous position of being the sole member of the board legally entitled to his seat. Neither will it oust all the acting directors, and allow the one person elected to perform all the duties of the office; but it will allow the directors who were elected at the last annual meeting to hold over until the new election takes place, for if, through accident, mistake, or misfortune, the annual election has elapsed, or the directors have not been chosen, it seems that the former officers would hold over until a new election was had.     2 Kent Com. 295.

*W. S. Ladd*, for the defendant.   I.   The charter of the Concord Railroad Corporation provides for the election of directors in the following terms,—" at which meeting seven directors shall be chosen by ballot, each proprietor being entitled to as many votes as he holds shares, provided they do not exceed one tenth part of the whole number."   Private Acts of 1835, *c.* 1, *s.* 10.   That this grant constitutes a contract between the state on the one hand and the corporators on the other, has been too long and too well settled to be now brought into discussion.   2 Kent Com. 306; Cooley Const. Lim. 279; Angel & Ames Corp., *s.* 767; Sedgwick Stat. and Const. Law. 581, where the cases are collected.   A change whereby it is provided that each proprietor shall be entitled to more votes than he holds shares, thus putting it in the power of the holder of a minority of the shares to choose one or more directors against the wish of the holders of a majority of the shares, would manifestly be a change in the intrinsic nature of the artificial person brought into existence by the act of incorporation, a change in the organic law of its being, and so a destruction of the vested rights of those who have embarked their money in the enterprise : for it was clearly the right of the purchasers of stock that the mode of providing for the management of the affairs of the corporation should not be changed without their consent.   This was one of the considerations upon which their money was paid; and the right is quite as important, and rests quite as fully upon contract, as does the right of persons entering a trading partnership, and making contribution to its capital stock, that the direction of the affairs of the firm shall not be changed from that specified in the articles of partnership without their consent.

In *Hays* v. *The Commonwealth*, 82 Penn. St. 518, it was held that the people of the state, by an amendment of their constitution, could not destroy exactly the same kind of a right, and secured to the stockholders by a provision in the charter identical in substance with the one above quoted from the charter of the Concord Railroad.   *Gordon*, J., in the above case, says,—" If, however, we annul this provision of the charter, and substitute the constitutional provision above referred to, this shareholder will have ten votes for any one of the ten candidates for the office of manager whom he may choose to select, or five for each of any two he may so choose.   Thus those holding a minority of the shares of the stock of this corporation would be enabled to do what under the charter is impossible, to wit, to elect, in spite of the majority, one or more of the managing officers.   Now whilst it cannot be said that this would not be an alteration in the terms of this charter, it is nevertheless urged that it is a mere regulation of the right of suffrage in corporations, but affects the vested rights of no one.   But if it be not a vested right in those who own the major part of the stock of the corporation to elect, if they see proper, every member of the board of directors, then I would like to know what a vested right

means. This was a part of the contract under which they entered into the company, and for which they paid their money. The compact was that they should have the power to elect those who should have the management and control of the funds which they advanced in this enterprise. . . . If the charter method of voting be a material part of the organic law of the company, it follows that the constitutional convention, even if it so intended, could not alter that method. . . . As there is in this case no allegation of a breach of any condition under which the Pittsburgh & C. S. R. R. Co. accepted its charter, or that the charter is in any particular obnoxious to the welfare of the citizens of this commonwealth, it cannot be successfully urged that it may be revised or abrogated by any state authority whatever "

It may, perhaps, be contended that the act of 1879 can be upheld on the ground that it is an amendment of the charter of the Concord Railroad, and that the right to amend was reserved to the state in the act making the grant. Private Acts 1835, *c.* 1, *s.* 18. The first answer to this proposition is, that the act in question is not in terms, and does not purport to be, an amendment of that charter. That the legislature did not intend it as an amendment is very strongly shown by the fact that no notice was given that an amendment would be applied for. It is contrary to the spirit of our institutions, contrary to all the analogies furnished by the practice of courts and legislative assemblies of every description, and contrary to justice and fair play, that questions affecting, perhaps destroying, important and valuable private rights should be mooted and settled behind the backs of those who are to be affected by the result, and without giving them an opportunity to appear and show cause why the proposed action should not be had. This one fact alone, therefore, furnishes very strong evidence that the legislature did not intend this act as an amendment of the charter. The act ought not to be given the interpretation and effect of a change of the charter in this particular, if it is capable of any other; because, although the right to amend is reserved in the charter, its exercise amounts to what would otherwise be the destruction of a vested right of property. Surely the fact that this vested property-right of the stockholder lies, as it were, at the mercy of the legislature, can have no other effect than to make the legislature exceedingly cautious that it is not destroyed or violated except upon very good cause shown; and when, as in this case, there is no proof or suggestion of any wrong or abuse on the part of the Concord Railroad or any of its stockholders, the strong presumption is that there was not an intention on the part of the legislature to destroy it. Such an intention will only be found upon the strongest evidence, and when the terms used admit of no other interpretation.

" By the theory of the British constitution, parliament is omnipotent; and hence an act of that body would undoubtedly be

effectual to the dissolution of a corporation. It is to the honor of the British nation, however, that this power, restrained by public opinion, rests merely in theory; and except in the instances of the suppression of the Order of Templars in the time of Edward the Second, and of the religious houses in the time of Henry the Eighth, we know of no occasion on which parliament have thought proper to dissolve, or confirm the arbitrary dissolution of, corporate bodies. When, in 1783, a bill was introduced for the purpose of remodelling the charter of the East India Company, it was opposed by Mr. Pitt and Lord Thurlow, not only as a dangerous violation of the charter of the company, but as a total subversion of the law and constitution of the country. In the nervous language of the latter, it was 'an atrocious violation of private property, which cut every Englishman to the bone.'" Angel & Ames Corp., *s.* 767. The relation in which our legislature stands to a corporation in the charter of which the right to amend is reserved, is the same as that of the parliament of Great Britain to a corporation in which no such right is reserved; for the right always remains in the parliament without reservation by reason of the omnipotence of that body. Chancellor Kent says "it is easy to perceive that if such a clause [a reservation of the right to amend], inserted as a formula in every charter and grant of the government, be sufficient to give the state an unlimited control, at its pleasure, of all its grants, however valuable the consideration upon which they may be founded, the great and salutary provision in the constitution of the United States, so far as concerns all grants from state governments, will become of no moment. These legislative reservations of a right of repeal ought to be under the guidance of extreme moderation and discretion." 2 Kent Com. 306.

Such considerations will induce the court to look carefully at this act to see if its language does not fairly admit of an interpretation which shall not have the effect of an amendment to the charter, whereby its constitution will be so radically changed, and the private rights of its stockholders so unreasonably disregarded and destroyed. We submit that it is well capable of such interpretation,—in fact, that any other would do violence to the manifest intention of the legislature. It purports to be a general law. Hence it is to be presumed that the intention of the legislature was that it should be prospective, and not retroactive, in its application and effect. "The general rule is, that no statute, however positive in its terms, is to be construed as designed to interfere with existing contracts, rights of suits, and especially vested rights, unless the intention that it shall so operate is expressly declared; and courts will apply new statutes only to future cases, unless there is something in the very nature of the case, or in the language of the new provision, which shows that they were intended to have a retroactive operation." Note to Potter's Dwarris 162, and cases cited. "We have before said that the legislature of a

state possesses all legislative power not prohibited by the constitution. But, by all known rules of interpretation, the general rule as to their power by its very nature is prospective. They are invested with the power to enact laws  Laws are rules of civil conduct, prescribed for and attaching themselves to the future actions of men. They must of necessity and from their nature be prospective; otherwise they cannot be rules of civil conduct. Laws cannot attach themselves to conduct antecedent to the creation of the rules themselves," etc. Potter's Dwarris, 164, *et seq.;* Morrison Dig. 160, 161, 162.

If this act is what it purports to be, namely, a general law, we are forbidden to give it such interpretation as will amount to an amendment, not only of the charter of the Concord Railroad, but of every other private corporation in the state, by art. 23 of the bill of rights, as well as by the fundamental doctrine of the common law above set forth, for that would be giving it a retroactive operation whereby vested rights would be taken away. But if, on the other hand, we undertake to say it is a private act, operating as an amendment of all those charters, and therefore within the power of the legislature, reserved when they were granted, we reach the conclusion that the legislature intended by one stroke to do in effect and to all practical intents the very mischief which the constitution and the rule of law were intended to protect the people against. What have all these corporations and all their stockholders done that they should be singled out for legislative vengeance in this way? Nothing at all, so far as now appears. How, then, can it be supposed that the legislature intended to visit them with an enactment so highly penal, especially when they put their enactment in the usual form of acts which are to take effect and be operative after instead of before their passage? We submit that this act cannot be regarded as an amendment to the charter of the Concord Railroad within the provision of *s.* 18, and that therefore, as a general law of the state, it can be given no operation except in the case of corporations incorporated after its passage.

II. The act of 1879, under which the relator claims, was never enacted in the only way provided by the constitution for the enactment of statutes, and was therefore never the law of the state. "The supreme legislative power within this state shall be vested in the senate and house of representatives, each of which shall have a negative upon the other." Const. N. H., Part II, art. 2. This point has been argued in the brief already furnished by Mr. Wilson, and the cases pretty generally cited. It is only proposed to refer to one or two other cases, and to present as our argument of the question a few brief quotations from opinions of courts where the matter appears to have been most thoroughly and carefully considered. In *The Borough of West Philadelphia,* 5 W. & S. 281, *Gibson,* C. J., says,—"Under a well balanced constitution the legislature can no more delegate its proper function than can

the judiciary. It is on the preservation of the lines which separate the cardinal branches of the government that the liberties of the citizen depend; for a consolidated sovereignty, in whatever form, is despotism, in so far as it subjects the governed not to prescribed rules of action, to which he may safely square his conduct beforehand, but to the unsettled will of the ruling power, which cannot be foreseen, and a government becomes consolidated in proportion as its legislative branch abandons its own functions, or usurps those which have been vested elsewhere. In the very constitution of things, the whole people of the state cannot assemble together to exercise the sovereign power in person; and it is not to be regretted that they cannot, for their rule, being untrammelled by anything but their own will, would be as arbitrary and fitful in its exercise as any other uncontrolled domination. When they delegate it to an undivided agency, they slip their hold of it and in turn become its slaves."

In *C. W. & Z. R. R. Co.* v. *Commissioners of Clinton County*, 1 Ohio St. 77, *Ranney*, J., delivering the opinion of the court, says,— " That the general assembly cannot surrender any portion of the legislative authority with which it is invested, or authorize its exercise by any other person or body, is a proposition too clear for argument, and is denied by no one. The inability arises no less from the general principle applicable to every delegated power requiring knowledge, discretion, and rectitude in its exercise, than from the positive provisions of the constitution itself. The people in whom it resided have voluntarily relinquished its exercise, and have positively ordained that it shall be vested in the general assembly. It can only be reclaimed by them by an amendment or abolition of the constitution. To allow the general assembly to cast it back upon them would be to subvert the constitution and change its distribution of powers without their action or consent. The checks, balances, and safeguards of that instrument are intended no less for the protection and safety of the minority than the majority. Hence, while it continues in force, every citizen has a right to demand that his civil conduct shall only be regulated by the associated wisdom, intelligence, and integrity of the whole representation of the state."

In *State* v. *Beneke*, 9 Iowa 203, *Woodward*, J., says,—" On this subject we entertain no doubts. The general assembly cannot legally submit to the people the proposition whether an act shall become a law or not; and the people have no power in their primary and individual capacity to make laws. They do this by representatives. There is no doubt of the authority of the legislature to pass an act to take effect upon a contingency. But what is a contingency in this sense and connection? It is some event independent of the will of the law-making power, as exercised in making the law, or some event over which the legislature has no control. For instance, the embargo laws and their cessation were

made to depend on the action of foreign powers. The will of the law-maker is not a contingency in relation to himself. It may be such in relation to another and external power, but to call it so in relation to himself is an abuse of language. Now, if the people are to say whether or not an act shall become a law, they become, or are put in the place of, the law-maker. And here is the constitutional objection. Their will is not a contingency upon which certain things are or are not to be done under the law, but it becomes the determining power whether such shall be the law or not. This makes them the 'legislative authority,' which by the constitution is vested in the senate and house of representatives, and not in the people." Special attention is called to the whole of the opinion of *Ruggles,* C. J., in *Barto* v. *Himrod,* 8 N. Y. 483. The consequences of sanctioning this method of legislation are not overdrawn by *Willard,* J., in the same case. He says,—"If this mode of legislation is permitted and becomes general, it will soon bring to a close the whole system of representative government which has been so justly our pride. The legislature will become an irresponsible cabal, too timid to assume the responsibility of lawgivers, and with just wisdom enough to devise subtile schemes of imposture to mislead the people. All the checks against improvident legislation will be swept away; and the character of the constitution will be radically changed."

But one case which seems to us to be in point the other way has been found,—*Smith* v. *Janesville,* 26 Wis. 291; and that, being put wholly upon the authority of a previous "local option" case in the same state, furnishes no discussion of the principle involved that aids us much in the inquiry.

It is true there are some expressions in the opinion of *Redfield,* C. J., in *State* v. *Parker,* 26 Vt 357, which indicate that in 1854 he was inclined to the idea that a popular vote upon a general law submitted to the people by the legislature might be regarded as a contingency, upon the result of which the proposition so submitted might become a law. A short extract from the opinion shows, however, that the decision of the case was not put at all upon that ground. He says,—"But the law of 1852 did not, even in form, depend upon the vote of the people for its coming in force. The statute in terms was made to come in force just when it did,—on the second Tuesday of March, 1853; and if there had been no meetings of the freemen called, or no vote had been taken, the statute would still have become a law just when it did. The only thing made contingent and conditional in the statute was, in one single event, that the operation of the law should be suspended until after the next session of the legislature. It may be said this difference is not much. I know that very well. But it is as much as that between a condition precedent and a condition subsequent; and this, in the case of an illegal condition, as it is claimed this was, is quite important. In the former case, the contract or act is rendered

void; and in the latter the condition is only avoided, and the contract or act remains in force. And we do not see but, upon sound reasoning and good logic, the result must be the same in regard to statutes. We think it must be and should be. The condition or proviso was only for suspending the operation of the statute: and if the legislature had no right to annex any such condition, then the statute will not be affected by it. It might have been wholly disregarded by the people, and the effect must have been the same. The law would have come in force on the second Tuesday in March. And did the taking a vote (which was in the affirmative, to be sure, but which, if it had been in the negative, was, it is claimed, of no force, and should consequently be disregarded) make the legal state of the enactment any different? We think not. And thus the form of enacting this statute seems to steer quite clear of the main argument upon which all the cases have gone, where similar statutes have been held invalid. And in regard to the statute of 1852, it cannot with any show of fairness be said the legislature did not enact the law, and fully pass upon all questions of constitutionality or expediency involved in the subject."

The distinction between this case and such cases as State v. Noyes, 30 N. H. 279, seems to be broad and well defined. A single point of difference is all that we consider it necessary now to suggest. Towns under our New England system are intrusted with very many and very important governmental powers and functions, among which is the power to adopt and enforce such reasonable regulations as may be thought best calculated to promote the peace, good order, and welfare of their communities. A police regulation that may be very wholesome and valuable in one town, may, on account of some diversity in population, geographical situation, or other cause, be inapplicable and inexpedient in another. Hence the legislature have properly gone very far in allowing to these miniature commonwealths considerable latitude in adopting or rejecting laws for the preservation of order and the regulating of their police affairs. This is obviously a very different thing from submitting the question whether a given act shall become the general law of the state, to the decision of the whole people of the state. In case of the local option laws referred to, the question is submitted to the very body politic to be affected by them. This case would bear a much closer analogy to those if the law had been left to take effect upon such corporations, and such only, as adopted it.

The attempt here is to force upon the people the burden and responsibility of deciding in their primary capacity whether a proposed measure shall or shall not become a general law of the state. That is exactly the business and duty of the legislature as prescribed by the constitution, and so is exactly what the legislature cannot require the people to do for them. To call such an expression of opinion by the people, as to the policy and expediency of

the measure, by the name of a contingency, with respect to the taking effect of the proposition as law, does not make it such.    It is simply a misuse of words.    In fact, it is no such thing.    In fact, it is the thing, and the only thing, which gives to the proposal the force and vitality of law.    The vote of the people is expressly made the fiat of the law-maker.    To call that fiat a "contingency," whereupon the taking effect of the law depends, is just like saying, "If a bill pending before the legislature passes both houses, and receives the approval of the governor, it will become law, otherwise not," which is saying, "If a thing happens, it will happen; if it does not happen, it will not happen; whether it happens or not is a contingency upon which its happening depends"—a kind of logic which does not make progress because it stands still.

Towns and cities are organized entities created by the legislature, with such faculties, functions, and powers, both public and private, and charged with such duties, both political and economical, as in the judgment of the legislature the public good requires. If the public good requires the existence of this class of legal persons, it surely requires that they should be endowed with all necessary and reasonable means and capabilities for self-preservation and protection, and with such faculties as are convenient and proper, under the general laws of the state, to promote their wellbeing.    Acts creating municipal corporations, and endowing them with such functions as are above alluded to, constitute legislation in the proper and legal sense of that term.    The exercise by them of the functions with which they are thus wisely endowed by their creator for the purposes suggested is not legislation in the proper and legal sense of that term, any more than the making of by-laws by a private corporation is legislation.    It is only because many of the duties and powers of municipal corporations are of a public and political character, that their acts, under authority conferred by general law and by their charters, seem more like an exercise of general legislative power than do the acts of a manufacturing corporation, done under authority given by their charter and the general law of the state.    Both derive their existence and powers from the same source.    One has for its prime purpose the promotion of the general welfare, and is therefore clothed with the powers, etc., necessary and convenient for the attainment of that end.    The other has for its prime purpose the carrying on of some lawful business whereby money may be made.    The character of each is determined in the outset with regard to the office it is to perform in the economy of the state.

The vote of a town to accept and adopt the provisions of any local option law is no more legislative, in the proper legal acceptation of the term, than the signing by ten men of articles of association to form a voluntary corporation under the statute.    In each case it is simply the expression of a wish to use and enjoy the benefits of a general law of the state.

*J. Y. Mugridge*, for the defendant.   I. This is an information·
brought by the attorney-general upon the relation of a private·
citizen, and could not be filed without leave of the court.   There·
is a distinction between cases where the proceedings are instituted
by the attorney-general *ex officio*, and without a relator, and cases
brought upon the relation of a private individual.   In the former
case, information is filed as of course, without leave of the court,
but in the latter case can only be filed by leave of the court first·
had and obtained for that purpose, and the application is not
granted as of course, but rests in the sound discretion of the court.
High Ex. Rem. 515; *State* v. *Stewart*, 32 Mo. 379; *State* v. *Law-
rence*, 38 Mo. 535; *State* v. *Buskirk*, 43 Mo. 111.

II.· A very important question presents itself as to what is the
true, legal construction of that portion of the law which provides
that "in all elections for directors or managers of corporations,
each member or stockholder may cast the whole number of his·
votes for one candidate, or may distribute them upon two or more
candidates, as he may prefer."   At an election in which a single·
officer or different officers of the same board by separate ballotings
are chosen, the question suggested would arise in this way :  In the·
ordinary manner of proceeding at stockholders' meetings to choose
officers, each stockholder throws one ballot, on which is endorsed
the number of shares for which he is entitled to vote ; and it has·
been generally understood that a voter, although voting on several
shares, could only represent them as a whole, and consequently
could not so divide his vote as that one part should be thrown for
one candidate and the balance for others.   In such a case this act
might have the effect to give the voter the right to divide his votes·
according to the number of shares voted by him, as he might elect.
But in cases where one balloting takes place for different members
of the same board, other considerations would arise.   With refer-
ence to such cases, the provisions of the act in question are so
vague and uncertain in their character as to place the matter in
great doubt.   The act only provides that each member or stock-
holder may cast "the whole number of his votes" for one candi-
date, or may distribute them, etc., but there is nothing in the law
defining what is meant by "his votes," or what those words com-
prehend.   The provision of Gen. Laws, *c.* 148, *s.* 18, which is still
in force notwithstanding the act in question, is that each stock-
holder in any corporation " may give one vote at any meeting
thereof for every share he owns therein."   If, under the law in
question, a stockholder is to be allowed to throw a number of votes
for one or more directors, equal to his number of shares multiplied
by the whole number of directors to be elected, the consequence is,
in case of a board of seven directors, like that of the Concord Rail-
road, that the stockholder is permitted to cast seven times as many
votes as he is allowed to under the general provisions of the law
above cited, which would be not only regulating the cast of "his

votes," as the act in its terms indicates, but would be also a multiplication of the number of the votes. The general laws referred to, by express limitation, restrict a stockholder in his vote to the number of shares owned by him; and his right of voting, "the whole number of his votes," is not enlarged, though he may vote for several candidates on the same ballot, but the votes will be regarded as being thrown for each separately, as if they were cast on separate ballotings, and the number is confined to the number of shares owned by him.

In this particular the act in question is clearly defective, and inadequate to accomplish the object suggested. In this respect it differs from the constitutional provisions in the state of Illinois with reference to the same matter. Those provisions are, that "in all elections of representatives as aforesaid, each qualified voter may cast as many votes for one candidate as there are representatives to be elected, or may distribute the same or equal parts thereof among the candidates, as he shall see fit." Rev. Sts., Ills., 1874, 62, *ss.* 7, 8;—see, also, *p.* 217, *s.* 54, as to minority plan for aldermen. Here is found a clear and express provision for an increase of votes which the object suggested necessarily demands.

The act in question is similar in its terms to the provisions of the revised constitution of Pennsylvania on the same subject. In the decision of *Hays* v. *Commonwealth*, 82 Penn. St. 518, it is assumed for the purposes of the discussion that the legal effect of that provision was the same as above suggested as being the object of the law. This was not the point, however, settled in that case. From what is said by the court, it would appear doubtful whether the consequence of the provision was designed to be, or was in law, what it was there assumed to be, because the provision, as originally prepared, as in the constitution of Illinois, included additional words to indicate the effect assumed, if intended, but those words were subsequently rejected. An examination of the case of *Com.* v. *Lintsman* (in the same state), 23 Pitts. L. J. 122, will show that the legal effect of the provision referred to does not extend so far as assumed in *Hays* v. *Commonwealth*, but only to allow a stockholder owning several shares to divide his votes among different candidates, but not to increase the number of his votes. The doctrine of that case is, that under the cumulative method of voting a stockholder may cast for one or more candidates as many votes as he owns shares, and is an authority in point to support the views expressed as to the effect of the act in this state, in similar terms, to be merely to regulate the method of casting what votes a stockholder may have under our general laws, and not to increase the number of votes in any way.

*Wm. L. Foster*, for the defendant. I. Since the decision of the Dartmouth College case, in 1819, it has ceased to be a point for discussion that the charter of a corporation is a contract, within the

clause of the federal constitution, which declares that no state shall pass any law impairing the obligation of contracts. Such laws, said Mr. Madison, are "contrary to the first principles of the social compact, and to every principle of sound legislation. . . . Very properly, therefore, have the convention added this constitutional bulwark in favor of personal security and private rights." The Federalist, No. XLIV. "It is not competent even for the royal prerogative, without the consent of the corporation, to alter or abridge a corporate charter. It can be revoked only in the case of a forfeiture for negligence or abuse of the franchise judicially ascertained." *P. W. & B. R. R. Co.* v. *Bowers*, 4 Hous. (Del). 506, 529–534. The constitution makes no distinction between executory and executed contracts, the latter, as much as the former, being within its protection. *Fletcher* v. *Peck*, 6 Cranch 87, 133. The contracts intended by the constitution are all those over which the state can have authority, and which, but for this provision, might be reached by state law. The contracts of the state itself are therefore intended, as much as those of individuals; and a state is thus precluded from impairing its own grants, unless the right to do so is reserved in the charter itself. 3 Pars. Con. 527; Cooley Const. Lim. 279; Potter's Dwarris 477. It may seem superfluous to cite authorities in support of a principle universally recognized; but the reasoning and arguments of the following, among the hundreds of cases to the same effect, are worthy of attention: *Fletcher* v. *Peck*, supra; *Huidekoper* v. *Douglass*, 3 Cranch 1; *New Jersey* v. *Wilson*, 7 Cranch 164; *Sturges* v. *Crowninshield*, 4 Wheat. 199; *Wilkinson* v. *Leland*, 2 Pet. 627; *Vanhorne* v. *Dorrance*, 2 Dall. 304; *Rice* v. *R. R. Co.*, 1 Black 358; *Bank* v. *Skelly*, 1 Black 436; *Commercial Bank* v. *The State*, 12 Miss. 439; *Gordon* v. *Appeal Tax Court*, 3 How. 133; *Woodruff* v. *Trapnall*, 10 How. 190; *State Bank of Ohio* v. *Knoop*, 16 How. 369; *Dodge* v. *Woolsey*, 18 How. 331; *The Binghamton Bridge Case*, 3 Wall. 51; *Furman* v. *Nichol*, 8 Wall. 44; *Home of the Friendless* v. *Rouse*, 8 Wall. 430; *Washington University* v. *Rouse*, 8 Wall. 439; *Murray* v. *Charleston*, 96 U. S. 432; *Farrington* v. *Tennessee*, 95 U. S. 679; *New Jersey* v. *Yard*, 95 U. S. 104, 114, 116; *Beer Co.* v. *Massachusetts*, 97 U. S. 25; *Keith* v. *Clark*, 97 U. S. 454; *Sala* v. *New Orleans*, 2 Woods 188. The charter of a railroad is within the constitutional prohibition; and any legislative act having the effect to abridge or restrict any power or privilege vested by the charter, which is material to the beneficial exercise of the franchise granted, and which must be supposed to have entered into the consideration which induced the corporation to accept the charter and to assume the duties imposed by it, is such an alteration as the constitutional provision forbids; and any act so operating is invalid. *P. W. & B. R. R. Co.* v. *Bowers*, supra; *Bailey* v. *P. W. & B. R. R. Co.*, 4 Harr. (Del.) 389.

The contract between the state and the Concord Railroad, which

provided that directors should be chosen by ballot, "each proprietor being entitled to as many votes as he holds shares," &c., was a contract expressing, granting, and confirming the democratic doctrine and the fundamental right of the majority to govern,—a right not peculiar to popular elections, but pertaining as well to all matters of control in corporations and other associations. The grantees of the Concord Railroad never understood they were accepting a charter which could afterwards be so perverted from its original design as to subject the will and power of the majority to the dictation and control of a minority, or permit an interference with the powers conferred upon directors, selected by the confidence and preference of the stockholders, by a factious individual, seeking the advancement of his personal schemes and ambition, without the confidence, and in disregard of the preference and will, of the majority. They never understood that, without their consent, they could be placed in such a position with regard to the choice of directors, to whom are entrusted the control of all their prudential affairs, as that, while one person might be enabled by the multiplication of his votes to defeat the will of the majority, another person might not by the multiplication of his votes defeat the scheme of an obnoxious minority. That such would be the practical effect of such a construction of the act of 1879, *c.* 54, as is given it by the relator, is manifest. For example: Suppose the whole number of votes cast for directors is 13,999. P, desiring to become a director, induces A, having 2,000 shares of stock, to multiply his vote by 7. and cast it for P, and so elect P. But B, having 2,000 shares of stock, and desiring to defeat the election of P, cannot, by any method of cumulation or distribution known to the law, cast 14,000 votes against P. Provisions so unequal, partial, and unjust, involving such a restriction of powers and privileges material to the beneficial exercise of the franchise, were never bargained for by the grantees when they accepted the charter of the Concord Railroad.

II. The right to amend the charter was reserved in the original grant; but the legislature never assumed nor intended to exercise the power of amendment. If they undertook to effect the same practical result by the legislation of 1879, their purpose was ineffectual because the method employed was unconstitutional. If their intention had been to exercise the power of amendment reserved by *s.* 18 of the charter of the Concord Railroad, they would have expressed that intention by the use of unequivocal terms; not, however (it is to be presumed), without having first given the corporation an opportunity to be heard in defence of such an invasion of their privileges,—not without proof of an "abuse of their franchise judicially ascertained." I suppose an amendment, in a particular so substantial and vital to the interests of the stockholders, is no more to be inferred by implication from the terms of a general law in which no express allusion is made

to the private act, than the repeal of a special act is inferred from a general law having remote reference to the subject of the special law. And though a statute may be repealed by necessary implication and without express words, the leaning of the courts is against such a doctrine. *Chegaray* v. *Jenkins*, 3 Sandf. 409; Potter's Dwarris 113, *n*. 9; *Goodrich* v. *Milwaukee*, 24 Wis. 422; *Horton* v. *Mobile School Com'rs*, 43 Ala. 598; *Gill* v. *The State*, 30 Tex. 514; *Kerlinger* v. *Barnes*, 14 Minn. 526. The act of 1879, therefore, is not an amendment of the charter of the Concord Railroad.

III. The act of 1879, being retrospective in its character, is in violation of the bill of rights, art. 23, and of the fundamental principles of the common law. This point is involved in the preceding.

IV. The act of 1879 is not a constitutional law, because it was not enacted "by the supreme legislative power." Const. of N. H., Part II, art 2. This power, originally possessed by the people, was committed by them to their representative body, the state legislature, in unlimited terms. The legislature holds and retains the power by constitutional grant, and it cannot recommit or delegate it to the people, or to any other body or authority whatever. Cooley Const. Lim. 116–125.

V. The relator is estopped from claiming his own election, because of the method of voting adopted by the stockholders, without the protest or dissent of the relator or any person representing the minority. Thus, it has been held that if a member of a board of directors of a corporation be present at the adoption of a resolution, and be aware of what is being done, and makes no opposition to its adoption, he must be presumed to have assented to it. *Mowry* v. *Ind. & Cin. R. R. Co.*, 4 Biss. 78. The report of the referee shows that the relator was present in person and by counsel, and knew "what was being done," and made no remarks "in the nature of suggestion, protest, or otherwise."

*Bingham & Mitchell*, for the plaintiff. I. The defendant asks the court to declare unconstitutional the act to provide for minority representation in corporations, passed in 1879. To be entitled to have this request granted, the defendant must show, and the court must be able to see, that this act is clearly, palpably, and beyond a reasonable doubt, repugnant to the constitution. It is presumptively constitutional, and cannot be pronounced otherwise except upon a very clear case. "When called upon to pronounce an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, invalid and void in consequence of its conflicting with some constitutional provision, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and will

never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond all reasonable doubt." *Sargent*, J., in *Rich* v. *Flanders*, 39 N. H. 312.   "It is never to be forgotten that the presumption is always in favor of the validity of the law, and it is only when manifest assumption of authority and clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it.   Such interference can never be permitted in a doubtful case."   *Cin. W. & Z. R. R.* v. *Com'rs*, 1 Ohio St. 77.   The rule is even more pointedly stated in *Groesch* v. *The State*, 42 Ind. 558.   "We can declare an act of the legislature void only when it violates the constitution clearly, palpably, plainly, and in such a manner as to leave no doubt or hesitation on our minds."

There is in this connection, also, another consideration to be kept in view, and that is this: The constitution of New Hampshire is not so much a grant of specific power, as it is a limitation of the exercise of general powers.   *Concord Railroad* v. *Greely*, 17 N. H. 47.   Consequently, no act of the legislature should be regarded as prohibited which is not so either in express terms, or by fair and reasonable implication.   *Lowrey* v. *Gridley*, 30 Conn. 450.

Governed by these rules, we are to examine the defendant's constitutional objections to this law, and the authorities relied upon to support them.   The defendant insists that taking "the sense of the voters of this state" upon the first section of the act is legislation, and that consequently it is not an act of the legislature, but an act passed by the people.   We maintain that it is an act of the legislature full and complete; and its going into effect on a designated day, or not at all, depended upon a contingency provided by the legislature in the exercise of its constitutional prerogative. The people were agents to determine a contingency, and not legislators.   The legislature enacted the law; the people were instrumental in creating a contingency, on the occurrence of which the law took effect.   The result of the vote applied to the going into effect of the law, and not to its passage or enactment: that had already been accomplished by the legislature.

The legislature preceded the act with the declaration that it be "enacted by the senate and house of representatives in general court convened," and not by the people.   Its effect and operation depend upon a condition or contingency.   Had there been no time fixed, and no mode prescribed to determine the time, the act would go into effect September 15, 1879.   Is not this delegating legislative functions to the agency which produces the revolutions of the globe?   If it was to go into effect upon each individual corporation's action, as suggested by the defendant's counsel, would this not be delegating to corporations the powers of legislation?   If it was to go into effect, as suggested by another of the defendant's counsel, when the Lake Shore charter was granted, or a general railroad law was passed, would not this savor a little of one legis-

lature delegating its powers to another? If it was to become a
law when a foreign power did a certain prescribed act, would it
not be delegating legislative powers to such foreign power? The
defendant will concur fully with us that either or all of these
agencies may constitutionally be employed by the legislature to
determine a contingency upon the happening of which a law takes
effect. But the defendant disagrees with us when we insist that
the people may be constitutionally entrusted with such agency.
The defendant's position, we submit, is founded in the confusion
and confounding of the plain distinction between the exercise of
legislative power in framing and enacting laws, and the exercise
of an altogether different and foreign, but subordinate, power in
producing the event or result upon which such enactment is to
take effect as a law.

To support his position, that this reference to the people is leg-
islation and not a contingency, the defendant, in his first brief,
cites forty-four different decided cases, excluding those of Massa-
chusetts and New Hampshire. A large number of them are direct
and conclusive authorities against the defendant's position. Some
of them are overruled in direct and explicit terms by some of the
others. Many of them deny the authority of some of the others.
All of them that are law to-day in the states deciding them are
either plainly distinguishable from this case, or are in direct con-
flict with the well settled law of New Hampshire as recognized
and settled in *State* v. *Noyes*, 30 N. H. 279. In that case, which
was decided in July, 1855, the constitutionality of a law, which
was to be in force only "in such towns as shall at some legal meet-
ing adopt the same," was involved. The respondent insisted, as
the defendant here does, that the law was "unconstitutional from
the manner of its enactment. . . . The general court has no
authority to delegate the power to enact laws to any men or body
of men." And in support of this position the respondent's coun-
sel cited one of the cases relied upon by the defendant here, viz.,
*Rice* v. *Foster*, 4 Harr. 479, which is a Delaware case decided in
1848. But the court held adversely to the position of the respon-
dents, and in the opinion delivered by Judge *Bell*, said,—" The case
does not call for the discussion of the question of the constitution-
ality of submitting general laws to the people, and making their
enactment dependent upon the popular vote. Many laws have
been so presented to the people, and acted upon by them; and it
is not at once apparent that there can be any sound objection to
the enactment of laws to take effect upon the occurrence of future
events, such as the legislature may prescribe. Laws framed to
take effect upon conditions dependent upon the pleasure of parties
to be affected by them are common everywhere."

Let us now review the decided cases cited by Mr. Wilson. Penn-
sylvania:—*Parker* v. *Com.*, 6 Penn. St. 507; *Com.* v. *Quarter Ses-
sions*, 8 Penn. St. 391; *Com.* v. *Painter*, 10 Penn. St. 214; *Locke's*

*Appeal,* 72 Penn. St. 491. The first case involved the constitutionality of a local option liquor license law. This was decided in 1847, and is the first case to be found, so far as we can find, which raises the question of the constitutionality of a law the operation of which is made dependent upon a popular vote of the people affected by it. The court held it unconstitutional. This is in direct conflict with the law as settled in *State* v. *Noyes, supra.* The second and third cases above cited practically and in effect overrule this case of *Parker* v. *Commonwealth.* The second was decided in March, 1848; and in that it was distinctly held that the legislature might repeal a law through the secondary means of a popular vote. In this case a new township had been erected from a part of another township, and the legislature submitted to the people of the old and new townships to determine by ballot whether the new township should be continued or annulled. The majority was to determine it. The law was held constitutional. In the third case, a law removing the seat of justice for Delaware county, if the majority favored it, was held constitutional. So it will be seen that they practically overrule the first case. This case of *Parker* v. *Commonwealth* is, as is said by *Johnson,* J., in *Johnson* v. *Rich,* 9 Barb. 680, decided December, 1851, the case which "has been the great source of mischief and confusion of ideas upon subjects of this character." Its authority was denied by *Johnson,* J., who further said of it,—"I have examined that case with great care, and I am constrained to say, with all due respect, that, in my judgment, it cannot stand the test of time and scrutiny upon the reasons assigned by the learned judge who delivered the opinion of the majority of the court."

The correctness of Judge *Johnson's* prophecy in respect to this case is clearly demonstrated by the fact that it was not followed by our own court in 1855, and has been repeatedly denied since by the courts of other states; and it was finally overruled by the court in which it originated, in *Locke's Appeal, supra,* decided 1873. The question involved in this case was the constitutionality of a license law, the operation of which depended upon the vote of the people of the localities desiring its operation. Judge *Agnew,* in the court's opinion, said,—"What did the legislature in this section submit to the people, and what did they not submit? This is quite as clear as any other part of the act. Each elector is to vote a ticket for license or against license. He is allowed by the law to say, 'I am for the issuing of licenses,' or, 'I am against the issuing of licenses,' and thus to express his judgment or opinion. But this is all he was permitted by the law to do. He declared no consequences, and prescribed no rule resulting from his opinion. Nor does the majority of votes declare a consequence. The return of a majority is but a mere numerical preponderance of votes, and expresses only the opinion of the greater number of electors upon the expediency or inexpediency of license in this

ward. When this is certified by the return, the legislature, not
the voters, declare it shall (or it shall not) be lawful for any license
to issue for the sale of spirituous liquor. Thus it is perfectly man-
ifest this law was not made, pronounced, or ratified by the people;
and the majority vote is but the ascertainment of the public sen-
timent, the expression of the general opinion, which, as a fact, the
legislature have made the contingency on which the law shall ope-
rate. . . . Indeed, it was not delegated to the people to decide
anything. They simply declared their views or wishes; and when
they did so, it was the fiat of the law, not their vote, which com-
manded licenses to issue or not to issue. . . . It is urged that
*Parker* v. *Commonwealth, supra,* decided the question before us.
That case was overruled soon after it was decided, not in express
terms, it is true, but its foundation was undermined when it was
held that laws could constitutionally be made dependent on a pop-
ular vote for their operation. The reasoning in *Parker* v. *Com-
monwealth* is fallacious, in assuming the fact that there was a del-
egation of legislative power. . . . The law did not spring
from the vote, but the vote sprang from the law, and the law
alone declared the consequences to flow from the vote. The as-
sumption that the act is not a law till enacted by the people is
the foundation of the argument, and with its fall the superstruct-
ure vanishes. The character of this law is precisely that of hun-
dreds of others which the legislative will makes dependent on
some future act or fact for its operation. To assert that a law is
less than a law because it is made to depend on a future event or
act, is to rob the legislature of the power to act wisely for the
public welfare whenever a law is passed relating to a state of
affairs not yet developed, or to things future and impossible to
fully know. Such an assertion attacks even the moral government
of the creator. . . . Then the true distinction, I conceive, is
this: The legislature cannot delegate its power to make a law;
but it can make a law to delegate a power to determine some fact
or state of things upon which the law makes, or intends to make,
its own action depend. To deny this would be to stop the wheels
of government. There are many things upon which wise and use-
ful legislation must depend which cannot be known to the law-
making power, and must, therefore, be a subject of inquiry and
determination outside of the halls of legislation. . . ." In
speaking further of *Parker* v. *Commonwealth, Agnew,* J., said,—
"Nor have I thought it necessary to refer to the decisions in other
states, for the plain reason, also, that our own decisions since
*Parker* v. *Commonwealth* rule the case; while that case was the
forerunner of the decisions of all the other states (except Del-
aware), and with its fall they have lost their chief prop and sup-
port." So it will be seen that Pennsylvania, the mother of the
heresy upon which the defendant founds his constitutional objec-
tion to this act, has in the most solemn and emphatic manner

thrown it overboard, and comes back where *Johnson*, J., prophesied she would come, and plants herself on the side of New Hampshire, and in support of our position.

*Rice* v. *Foster*, *supra*, is the only case cited from Delaware, and it was decided in 1848.    This involved the constitutionality of a local option liquor law.    The court held the law unconstitutional, because its operation depended upon the popular vote of the people of the different counties.    It is in direct conflict with *State* v. *Noyes*, *supra*, and is cited in that case by the respondent.    Its authority was denied by the court, or, at least, a contrary doctrine was settled by the court in that case.    The doctrine of this case having been repudiated in 1855, it is now too late to ask the court to overrule its own decision for the sake of recognizing this as an authority.

The defendant cites from New York, *Thorne* v. *Cramer*, 15 Barb. 112; *Bradley* v. *Baxter*, 15 Barb. 122; *Barto* v. *Himrod*, 8 N. Y. 483; *Bank* v. *Brown*, 26 N. Y. 467; *Corning* v. *Greene*, 23 Barb. 33; *Gloversville* v. *Howell*, 70 N. Y. 287.    We cite *Johnson* v. *Rich*, *supra*; *Clarke* v. *Rochester*, 24 Barb. 476.    In *Thorne* v. *Cramer*, *Bradley* v. *Baxter*, *Barto* v. *Himrod*, and *Johnson* v. *Rich*, are involved the constitutionality of the New York school law, which contained the following provision : The "electors shall determine by ballot, at the annual election to be held in November next, whether this act shall or shall not become a law."    *Thorne* v. *Cramer* was decided in October, 1851, by the New York supreme court, and the law held unconstitutional, upon the authority of *Parker* v. *Commonwealth*, *supra*, which we have before commented upon, and shown to have been overruled even at the time it was here cited as an authority.    *Bradley* v. *Baxter*, *supra*, decided in April, 1853, held the law unconstitutional, upon the authority of *Parker* v. *Commonwealth* and *Rice* v. *Foster*, *supra*, one of which was then overruled in its own state, and both of which are in conflict with the doctrine of our own case of *State* v. *Noyes*.    The case of *Barto* v. *Himrod* was decided in the same way in 1853, following the doctrine of the supreme court cases of *Thorne* v. *Cramer* and *Bradley* v. *Baxter*.    In 1851, the supreme court of New York held this law constitutional in *Johnson* v. *Rich*, *supra*.    In delivering the court's opinion, *Johnson*, J., said,—"The substance and plain import of the two sections, taken together, are, that the act shall become a law on a day certain, upon the condition that a majority of all the votes cast in the state upon the subject shall be, when canvassed, found in its favor, and that otherwise it shall be null and void.    The proviso is, not that it shall not be enacted by the legislature, but that it shall not become operative as a law after its enactment except upon the condition or proviso being fulfilled.    In short, they enacted that the enactment should not become a law of the land except upon the happening of a certain event, which was a majority of the votes being cast in its favor.    But the position is

assumed and urged with great strenuousness, that because the act in question could not become a law unless a majority of the electors should vote in its favor, it follows, as a necessary consequence, that the electors passed the act at a general election, and that the act undertook to clothe them with legislative power. But this consequence by no means follows. The same might be said of every act which is passed to take effect upon the happening of some event, certain or uncertain. It is no law unless the event happens; and yet it has never been supposed that any legislative power was conferred upon the agency by which the event was brought about. . . . The whole difficulty seems to me to have arisen from confounding the distinction between the exercise of legislative power in framing and enacting laws, or a statute which is to become a law, and the exercise of another altogether different and foreign but subordinate power, in producing the event or result upon which such enactment is to take effect as a law. The distinction seems to me too broad and obvious to be overlooked by any mind, the avenues to which are not too firmly barred by foregone conclusions, and which is unbiased by a fixed habit of constitutional scruples." The doctrine of this case was recognized in *Clarke* v. *Rochester, supra,* decided in 1857. *Corning* v. *Greene, supra,* cited by the defendant, does not raise this question. The question in *Bank* v. *Brown* was upon the constitutionality of an act which authorized the electors of an incorporated village to determine what sections of the general incorporation act should apply to their village. The court held the law constitutional. So far, then, as this is an authority at all, it is one for the plaintiff. In *Gloversville* v. *Howell,* a local option liquor law was held constitutional. This, also, is an authority for the plaintiff instead of for the defendant. The New York courts disagree; and there is not only a conflict of opinion, but a conflict of decision. The doctrine of those courts adverse to our position has been undermined and practically overruled by the later decisions of the same courts.

We will next call attention to Vermont. *State* v. *Parker,* 26 Vt. 357, decided March, 1854. This involved the constitutionality of the Vermont liquor law, passed November, 1852. It provided that on the second Tuesday of February, 1853, a meeting of the freemen be holden to vote "upon their judgment and choice in regard to this act," and "if a majority of the ballots cast shall be 'No,' then this act shall take effect in December, 1853." The vote was "Yes," and the act went into effect in March, 1853. The act was held constitutional by the court. *Redfield,* C. J., in the court's opinion, said,—"In this state the constitution vests the legislative power in a general assembly, consisting of a house of representatives and the senate; and if the mode of proceeding under consideration is equivalent to giving legislative power to the people at large, it is, no doubt, in conflict with the constitution. But it is not very obvious to us why this should be so regarded, unless it is

done as a matter of argument, and to justify a foregone conclusion, which is not one of the legitimate elements of a judicial determination. . . . And it is admitted on all hands that the legislature may enact laws the operation or suspension of which shall be made to depend upon a contingency. This could not be questioned with any show of reason or sound logic. It has been practised in all free states for hundreds of years, and no one has been lynx-eyed enough to discover, or certainly bold enough to declare, that such legislation was, on that account, void or irregular. And it is, in my judgment, a singular fact, that this remarkable discovery should first be made in the free representative democracies of America; and in regard to taking the sense of these same people upon the expediency of legislation, where the legislators are confessedly the mere agents and instruments of the people, to express their sovereign and superior will, to save the necessity of assembling the people in mass; and when, from the very nature of the case, the representative is in honor and good faith bound to conform his action to the will and desire of his constituents. . . . Congress passes laws almost every session, whose operation is made contingent upon the revenue laws of foreign states, or their navigation laws or regulations, and upon a hundred other uncertainties more or less affected by the will or agency of voluntary beings or communities . . .; and of the perfect regularity and constitutionality of such enactments, no question was ever made. . . . If the operation of a law may be fairly made to depend upon a future contingency, then, in my apprehension, it makes no essential difference what is the nature of the contingency, so it be an equal and fair one, a moral and legal one, not opposed to sound policy, and so far connected with the object and purpose of the statute as not to be a mere idle and arbitrary one. . . . After a full examination of the arguments by which it is attempted to be maintained that statutes made dependent upon such contingencies are not valid laws, and a good deal of study and reflection, I must declare that I am fully convinced, although at first, without much examination, somewhat inclined to the same opinion, that the opinion is the result of false analogies, and so founded upon a latent fallacy. It seems to me that the distinction attempted between the contingency of a popular vote and other future uncertainties is without all just foundation in sound policy or sound reason, and that it has too often been made more from necessity than choice,— rather to escape from an overwhelming analogy, than from any obvious difference in principle in the two classes of cases."

*Bull* v. *Read*, 13 Grat. 78, was decided October, 1855, and involved the constitutionality of an act establishing a free school. Its going into effect was made dependent upon the vote of the several counties. It was objected that its operation and effect having been left dependent upon a popular vote, rendered the law unconstitutional. But it was held constitutional by the court, Judge *Lee*

saying,—"Now, if the legislature may make the operation of its act depend on some contingency thereafter to happen, or may prescribe conditions, it must be for them to judge upon what contingency or what condition the act shall take effect. They must have the power to prescribe any they may think proper; and if the condition be that a vote of approval shall be given by the people affected by the proposed measure, it is difficult to see why it may not be as good and valid as any other condition whatever. . . . To say in such a case that the act is made by the voters and not by the legislature, is to disregard all proper distinctions, and involves an utter confusion of ideas upon this subject. Whenever the contingency upon which a law is to take effect depends upon the act of third persons, it might be said, with equal truth, that the law was enacted by those persons instead of by the legislature. . . . That its operation should depend upon the result of the vote is as much a part of the legislative will as any other of its provisions, and there can be no difference in principle depending on the nature of the event or contingency upon which the act is to take effect, though the differences in kind and degree may be without end."

The Michigan case is *People* v. *Collins*, 3 Mich. 343, decided in 1854. This involved the constitutionality of a liquor law : the time it was to go into effect, or whether it was to go into effect at all, was left to be determined by a vote of the people. The court were equally divided, four holding it constitutional, while four others held it unconstitutional. This is no decision of the question (*Railroad* v. *Railroad*, 50 N. H. 166), and consequently it is not an authority either way.

*C. W. & Z. R. R.* v. *Com'rs*, 1 Ohio St. 77; *Peck* v. *Weddell*, 17 Ohio St. 271. In the first case, a law permitting the people of a county to subscribe for railroad stock, if the majority of voters decided in favor of it, was held constitutional. From the court's opinion, Judge Ladd, in the brief he furnished for the defendant, quoted; and immediately following that quotation, we quote the following: "But while this is so plain as to be admitted, we think it equally undeniable that the complete exercise of legislative power by the general assembly does not necessarily require the act to so apply its provisions to the subject-matter as to compel their employment without the intervening assent of other persons, or to prevent their taking effect only upon the performance of the conditions expressed in the law." The second case is as to the constitutional right of the legislature to pass a law making the removal of a court-house dependent upon the popular vote. The court held the law constitutional. We fail to discover anything in either case adverse to our position, but, on the contrary, so far as either is an authority upon the question at bar, it is an authority for the plaintiff.

The Missouri cases are *State* v. *Scott*, 17 Mo. 521 (1853); *State* v. *Field*, 17 Mo. 529 (1853); *State* v. *Wilcox*, 45 Mo. 458 (1870);

*State* v. *Linn Co. Court*, 44 Mo. 504 (1869). The first case cited involved the constitutionality of a law authorizing towns to subscribe for railroad stock, if the town should so decide by vote. It was held constitutional. In *State* v. *Field* it was held that a law creating a new county, by vote of the people who were to constitute it, was constitutional. In *State* v. *Wilcox*, a school law, to go into effect upon a vote of the different school-districts, was held constitutional. *State* v. *Linn Co. Court, supra.* This simply involved the validity of a law authorizing towns, if so decided by a popular vote, to aid in constructing a railroad. The law was held constitutional. It will be seen, then, that these cases, so far as they are at all applicable to the question here raised, sustain the plaintiff.

*Cheaney* v. *Hooser*, 9 B. Mon. 330, was decided 1848. This simply involved the constitutional power of the legislature to confer upon a local corporation the power of taxation. It was held that the legislature had such power. We cite, as sustaining our view, *Commonwealth* v. *Weller*, 14 Bush. 218 (1878). This was upon the constitutionality of a liquor law submitted to the people. It was held constitutional. The fourth section of the act provided "that this act shall take effect whenever it shall be ratified by a majority of the voters of said county voting thereon at any election in said county." In this case, *Prior*, C. J., said,—"The popular will, expressed for or against the provisions of the law, does not, in any manner, destroy or affect the legislative intent. The law was enacted in order that the people of Bullitt county might accept or reject its provisions, and it was in force and effectual as a law for that purpose when it left the hands of the executive with his approval. The law was then perfect in all its parts, and could be enforced without any other legislation. This character of legislation has been sanctioned by the courts of this state and indulged in by the representatives of the people since the formation of the state government. The construction of the language of the act before us is, that it is to take effect like any other law. When it passed the legislature and was signed by the executive, it then became a law, and, by reason of the law, the people interested in its passage were authorized to vote for or against its provisions. That its operation is made to depend on the popular will is a part of the law itself, and its going into operation on the contingency that the people voted for it, was the legislative will on the subject." The court cites approvingly *Bull* v. *Read, supra,* and *Marshall* v. *Donovan*, 10 Bush. (Ky.) 681.

*State* v. *O'Neill*, 24 Wis. 149; *Smith* v. *Janesville*, 26 Wis. 291. The first case was decided in February, 1869. In it was involved the constitutionality of a law which provided for a board of public works for the city of Milwaukee, providing the people of the city, by a majority vote, accepted it. It was contended that this reference to the people was a delegation of legislative authority, and rendered the act unconstitutional. This position was not sustained,

and the act was held constitutional. This case criticises the doctrine of *Barto* v. *Himrod*, *supra*, and denies it as an authority. The latter case, *Smith* v. *Janesville*, was decided in 1870, and involved the constitutionality of an act of the legislature, which provided that it was not to take effect unless approved by the people of the state. As to the objection that such reference of it to the people was unconstitutional, the court said,—"This was no more than providing that the act should take effect on the happening of a certain future contingency, that contingency being a popular vote in its favor. No one doubts the general power of the legislature to make such regulations and conditions as it pleases with regard to the taking effect or operation of laws. They may be absolute, or conditional and contingent; and if the latter, they may take effect on the happening of any event which is future and uncertain. . . . It being conceded that the legislature possesses this general power, the only question here would seem to be whether a vote of the people in favor of a law is to be excluded from the number of those future contingent events upon which it may be provided that it shall take effect. A similar question was before this court in a late case (*State* v. *O'Neill*, *supra*), and was very elaborately discussed. We came unanimously to the conclusion, in that case, that a provision for a vote of the electors of the city of Milwaukee in favor of an act of the legislature before it should take effect was a lawful contingency, and the act was valid. That was an act affecting the people of Milwaukee particularly, while this was one affecting the people of the whole state. There the law was submitted to the voters of that city, and here it was submitted to those of the state at large. What is the difference between the two cases? It is manifest, on principle, there cannot be any. The whole reasoning in that case goes to show that this act must be valid. as will be seen by reference to that opinion." This is an especially important authority, because the court meet and settle the question that, in principle, there is no constitutional difference between a contingency dependent upon the action of the people of a school-district, town, city, county, or members of a corporation, and that of the people of a state. The court say,— "It is manifest, on principle, there cannot be any."

*Paterson* v. *Society*, 4 Zab. 385; *State* v. *Morris*, 36 N. J. (7 Vroom) 72. In the first case it is held that submitting a charter to the acceptance of the people is not the delegation of legislative authority. This was decided in February, 1854, and it discusses *Parker* v. *Commonwealth* and *Rice* v. *Foster*, *supra*, but neither directly approves or denies the doctrine settled by them. The second case was decided in 1872. The local option license law, which provided for granting license upon a vote of the people, was held constitutional. So far as either of these cases bears upon the question under discussion, they sustain the plaintiff's view. They certainly are not authority for the defendant's position.

*Maize* v. *The State*, 4 Ind. 343; *R. R. Co.* v. *Geiger*, 34 Ind. 185. The first case involved the constitutionality of a local option law. It was decided in 1853. The law was held unconstitutional under a special clause of the constitution of Indiana: "Local laws for the punishment of offenders, and for the regulation of county and township business, are expressly forbidden." Sec. 22 of art. 4, Ind. Const. It is in conflict with our own case of *State* v. *Noyes*, decided two years later. This case is also criticised by the court, and somewhat questioned, in *Groesch* v. *The State*, 42 Ind. 558. After saying that it is not necessary, in the case there under discussion, to either approve or overrule *Maize* v. *State*, the court say,—"It may be remarked, however, that there are several cases [and then cites 24 Barb. 446, 28 N. Y. 605, *Locke's Appeal*, *supra*, 21 Vt. 456, and case in 36 N. J. 72] where legislation similar to the statute of 1853, which was in question in the *Maize* case, has been held to be constitutional and valid." This case was decided in 1873, twenty years later than the *Maize* case. It will be seen, then, that this case is not only in conflict with our own case, decided two years after, but, twenty years after it was decided, is questioned by the court that made it. This can be given but little if any weight against the constitutionality of this law. The case in 34 Ind. 185, decided in 1870, simply involved the constitutionality of a law authorizing a county to subscribe for railroad stock if a majority of the voters so decided. This was held constitutional, and, so far as it goes, supports the plaintiff's position.

The Iowa cases cited by the defendant are *Santo* v. *State*, *supra; Morford* v. *Unger*, 8 Iowa 82; *Geebrick* v. *State, supra; State* v. *Beneke, supra*. *Santo* v. *State* involved the constitutionality of a license law, which was referred to the people of the state for acceptance or rejection. The court held the act unconstitutional upon the authority of *Parker* v. *Commonwealth*, then practically and now absolutely overruled by the court which made it. *Rice* v. *Foster*, which is in direct conflict with and was repudiated by our own court in *State* v. *Noyes* in 1855; and the New York cases, which were denied at home by some of the New York courts at least, as we have already shown. The cases of *Geebrick* v. *State* and *State* v. *Beneke, supra*, both held local option liquor laws unconstitutional. These decisions were based upon the case of *Santo* v. *State, supra*, and the Pennsylvania, Delaware, and New York cases there cited. Both of these cases are in conflict with *State* v. *Noyes*. *Morford* v. *Unger* does not raise this question, or any question of a similar character, as we read it.

*Alcorn* v. *Hamer, supra* (1860), involved the constitutionality of a law authorizing the taxation of the inhabitants of certain designated counties, but providing for its submission to the people to be voted on first. The law was held constitutional. It is very difficult, we submit, to see how this can sustain the defendant in his claim. If it bears either way, it is against him.

*Gorham* v. *Springfield, supra* (1842), is a pauper case, and we have searched in vain to find even the most remote allusion to this question, or any one like it. In this connection, however, it may be said that the general prohibitory law of Maine, submitted to and accepted by the people of Maine in 1858, has undergone all sorts of criticisms and questions; but no one has yet, so far as the reports of that state show, been bold enough, or lynx-eyed enough, to question its constitutionality because submitted to the people.

*People* v. *Reynolds, supra* (1848). The act, the constitutionality of which was here questioned, provided for the division of Gallatin county, if so voted by a majority of the people. It was contended that its reference to the people, or taking effect upon their action, rendered it invalid. But it was held constitutional. In this case the court said,—" To establish the unconstitutionality of this act, it is assumed that, instead of being a law finished and obligatory from the hands of the general assembly, this is merely a bill prepared by that department of the government, and submitted to the people of Gallatin county, to be by them passed into a law, or defeated at the polls. This assumption is not true in fact. The law, as passed, was complete and perfect, although its principal provisions were to take effect upon a contingency, the determination of which did not depend upon the exercise of legislative powers by the people, but upon an expression they were authorized to make, rather in the execution than in the enactment of the law, an expression to be made in a legitimate and ordinary way. . . . It is easy to say that it is the business of the legislature to make laws; but then we must inquire, What kind of laws may be made? Must they be full, complete, perfect, absolute, depending upon no contingency, and conferring no discretion? This would be absolute legislation, exhausting legislative power on the subject-matter of the law. We presume that nowhere has constitutional learning advanced so far as to assert this doctrine." In this case the court fully reviews the cases of *Parker* v. *Commonwealth, supra,* and *Rice* v. *Foster, supra,* and denies them as authority. The doctrine of this case of *People* v. *Reynolds* was in 1869 affirmed by the highest court of Illinois in *People* v. *Salomon,* 51 Ill. 54. And both decisions were, in 1876, affirmed by the same court in *Guild, Jr.,* v. *Chicago,* 82 Ill. 476. Illinois, then, may be said to sustain fully our position.

*State* v. *Swisher,* 17 Tex. 441 (1856), holds a local option law unconstitutional. But before the case was decided the law was repealed; and therefore the court, in Judge *Liscomb's* opinion, said,—" The question presented is not now of very general interest, as the act, whether constitutional or not, has been repealed. We shall, therefore, not give to it the elaborate investigation that we would otherwise have felt called on to bestow on it." This decision is worth but little for any purpose, the court giving it confess-

ing that no proper investigation was made. There is another feature of it which adds to its unreliability as an authority: the attorney-general claimed to have collected all the authorities upon the subject, and yet *State* v. *Noyes*, decided by our own court the year before, and which is directly in conflict with this decision, was not cited.

*Brown* v. *Copeland*, 3 R. I. 33, has no application. The law in question was one which provided for the repeal of a law on the affirmative vote of the people. That was legislation. No one pretends that the people can repeal a law.

*Hobart* v. *Supervisors*, 17 Cal. 23 (1860); *Ex parte Wall, supra* (1874); *People* v. *Nally*, 49 Cal. 478 (1875). In the first case, the question was, Is a law constitutional which authorizes a county to purchase railroad bonds, if the town, by a majority vote, so decide? It was held constitutional. The court said,—" The legislature frame the law, and fix its terms and provisions; but they declare that this law shall only take effect in a particular event, that event being the assent of the people interested." In *Ex parte Wall* the court held unconstitutional a liquor license law which was to take effect upon the vote of the people of the town desiring license. This is in conflict with our own case of *State* v. *Noyes*, and is the decision of a bare majority of the court. Two of the judges dissented. This case is also practically overruled by *People* v. *Nally*. In this case, the act in question provided for the annexation of the territory constituting the county of Klamath to the counties of Siskiyon and Humboldt, if the popular vote of the people of Klamath favored it. This act was held constitutional, and its reference to the voters was not a delegation of legislative power. The court said,—" Whilst it is undoubtedly true that there is a considerable conflict in the authorities on the question whether an act of the legislature, which is to take effect or not, as it may be determined by the popular vote, is a delegation of the law-making power, I think the weight of authority, in this state and elsewhere, fully supports the negative of the proposition." We may confidently set California down as supporting our view now.

The Massachusetts authorities recognize the same legislative power to enact laws, the operation of which may depend upon a popular vote. *Com.* v. *Bennett*, 108 Mass. 28; *Com.* v. *Dean*, 110 Mass. 358; *Stone* v. *Charlestown*, 114 Mass. 221. In the latter case it was held that "A statute uniting two municipalities, and providing that the act shall not take full effect unless accepted by the voters of the respective municipalities, is not unconstitutional as a delegation of legislative power."

For further authorities in support of our position, we ask attention to *Fell* v. *State*, 42 Md. 71 (1875), *State* v. *Cooke*, 24 Minn. 247 (1877). These authorities fully sustain the view that the voters, in respect to a law the operation or going into effect of which depends upon their action, are not exercising legislative

privileges, but are simply agents in determining a contingency, on the occurrence of which the law goes into operation. The voters have nothing to do with the passage or enactment of the law,— simply with its effect and operation. Upon a full review of all the authorities bearing upon this subject, it is submitted that the constitutionality of this act is not even doubtful. The more the question is studied, the more manifest it becomes that the action of the people was simply a determination of a contingency by open, fair, and legitimate means. The constitution nowhere prohibits such means to determine a contingency. The constitution nowhere prohibits the passage of a law the operation of which depends upon a contingency. In the passage of laws, the legislature is granted broad latitude. It is authorized to " establish all manner of wholesome and reasonable orders, laws, statutes," with no restrictions except when "repugnant or contrary" to the constitution. Where is the constitutional provision which prohibits the legislature from making the people agents to determine a contingency upon the happening of which a law is to go into operation? It is nowhere to be found. And in addition to this, as said by *Bartol*, C. J., in *Fell* v. *State, supra*,—"Every intendment ought to be made in support of the legislative enactment, and it is not to be declared invalid except for the plainest and most conclusive reasons." As said by the court, in *Perry* v. *Keene*, 56 N. H. 530, "All questions of mere expediency, and all questions respecting the just operation of the law, within the limits prescribed by the constitution, were settled by the legislature when it was enacted. The court have only to place the statute and the constitution side by side, and say whether there is such a conflict between the two that they cannot stand together." But the statute, as we have before seen, to be pronounced unconstitutional, must plainly appear to be in conflict with the organic law; otherwise it must be upheld.

II. Even if it was admitted by the plaintiff, or determined by the court, that the reference of section one to the people, as contemplated by sections two and three, was unwarranted by the constitution, that would not establish the unconstitutionality of section one. Because, unless January 15, 1881, was determined as the time section one should go into effect in a constitutional way, then, in contemplation of the law and the constitution, no time was limited for section one to take effect, and it therefore took effect September 15, 1879. G. L., *c*. 1, *s*. 36. And we take the position that unless its reference to the people was constitutional, the act took "effect on the fifteenth day of September next following" its passage by the legislature. An act, part of which is unconstitutional and part constitutional, will be upheld by the court to the extent of the constitutional part. From this act eliminate all the defendant claims to be unconstitutional, and there is left a complete law in all its parts; no time being fixed, or no con-

stitutional mode for fixing a time being prescribed, the time it goes into effect is governed by the general law.

III. The defendant says this act interferes with the vested rights of the stockholders, and is therefore unconstitutional. He says that, under the reserved right of alteration, amendment, or modification of the charter, or any of its provisions, the legislature cannot, by a general law, either alter, amend, or modify this charter, or any of its provisions. The right is reserved by the legislature in the broadest and most comprehensive terms, viz., "and that the legislature may at any time hereafter alter, amend, or modify this act, or any of its provisions." The right of amendment was not only reserved, but also the right to alter or modify any of its provisions. The legislature, in this charter, did not contract to notify the corporation, as suggested in one of the defendant's briefs, in case it contemplated an exercise of its reserved right. A general act of the legislature, under the reserved power, has the effect to alter, amend, or modify a private act. Pierce Railroads 10; *Bangor, Oldtown & M. R. R.* v. *Smith,* 47 Me. 34; *City of Roxbury* v. *Providence R. R.*, 6 Cush. 431; *Mechanics and Traders Bank* v. *Bridges,* 30 N. J. Law 112; *State* v. *Com'r R. Taxation,* 37 N. J. Law 230; *Dist.* v. *Whitehead,* 13 N. J. Eq. 290; *Daw* v. *Metropolitan Board of Works,* 12 C. B. N. S. 161; *Company* v. *Clarke,* 13 C. B. N. S. 838. "A special charter may, under the reserved power, be repealed by a general law." Pierce Railroads 10; *Bank* v. *Bridges, supra.* "The question is always one of legislative intent; and the intent to abrogate the particular enactment in an earlier statute by a general enactment in a later statute is sufficiently manifested where the provisions of the two enactments are so inconsistent that they cannot stand together." *State* v. *Com'rs, supra.* "A clause in a private act of parliament, which is quite inconsistent with a clause in a subsequent public act dealing with the same subject, is thereby repealed." *Company* v. *Clarke, supra;*—see, also, *Com.* v. *Liquors,* 115 Mass. 154; *Railroad* v. *Railway,* 118 Mass. 293. The defendant claims that the case of *Hays* v. *Commonwealth,* 82 Penn. St. 518, sustains him. An examination of this case, it is submitted, will clearly demonstrate that it does not sustain him. It was the application of a constitutional provision, adopted subsequent to the creation of the corporation, that was involved in that case. It was held by the court that the provision of the constitution did not apply, because existing corporations were "excluded by the very terms of that instrument." And the court say,—"It might apply to a legislative enactment attempting to alter this charter, but it cannot apply to this case, arising as it does directly on the constitution itself, for it is excluded by the very terms of that instrument." This is not an authority for the position that a general act cannot alter or modify the provisions of a private act.

IV. The defendant denies the right to multiply the number of

shares by the number of directors to be chosen, if a shareholder casts all his votes for one. The language of the defendant's first brief upon this point is,—"It is quite evident, however, that the minority law does not confer the right, as it makes no mention of a multiplier or multiplicand, and it does not in terms increase the number of votes a stockholder may cast." We adopt the language of the Pennsylvania court, in answering a similar position in *Hays* v. *Commonwealth, supra.* "This section is understood to confer upon the individual stockholder the right to cast all the votes which his stock represents, multiplied by the number of directors or managers to be elected, should he think proper to do so. Though from this section, as originally proposed, words nearly similar to those we have used were stricken out, yet we have no doubt we have in our statement embodied the intention of the convention. If, indeed, we do not in this manner reach the meaning of this part of the constitution, it has none; for it would be a vain thing to propose to confer a power upon members of a corporation which they already possessed."

V. The defendant contends that the relator has waived his right to a directorship by reason of his proper conduct in the meeting. It was not necessary that the relator should be boisterous and loud in his protestations and claims, or make them himself. It was sufficient for him to be represented in an orderly manner by two lawyers, Messrs. Copeland and Lyford, whose purpose was to protect his rights and insist upon them. It could hardly be said that a prisoner, while in court, before trial began, had waived his right to a fair trial by his personal silence and proper conduct. The relator, through his counsel at this meeting, where the majority of the stock-owners designed a disregard of this act, asked "how the votes for Mr. Pearson were cast,—one or seven for every share." To which the reply made was "that the votes had been cast, and the record would be made." And Mr. Copeland made a still more direct inquiry, viz., "if he or they were to understand that the minority representation law had been disregarded." To this "the chairman answered that it had not, and that the records of the vote would be made." "Mr. Copeland further inquired if seven votes had been cast for Mr. Pearson on every share of stock that was voted for him, to which question there was no answer." What more could Mr. Pearson do, or could be done for him? Declamation was useless; the result had been determined upon; protestation was futile; inquiries had ceased to provoke answers. There was left no alternative but silence and submission for the time, and an appeal to another tribunal.

*Wm. Power Wilson,* in reply. That the maxim *delegata potestas non potest delegari* applies as well to delegated public authority as to delegated private authority, has been recognized, not only in those cases where the principle has been sustained, but also in

those where the applicability thereof has been denied.    It will not
be seriously contended, should a governor allow the electors of the
state to decide whether a criminal, convicted of a capital crime,
should be pardoned or executed, or should a court of justice render
a decision allowing the electors to decide whether judgment should
be entered for the plaintiff or for the defendant, that in the first case
a pardon so granted would be efficacious, or that in the second case
a title derived under such a judgment would be of much value.
The defendant contends that the same principle applies to the
legislative as to the executive or judicial authority, and that the
power to make laws cannot be delegated by the legislature to any
persons or collection of persons, any more than can the powers
delegated to the executive or judicial authorities be delegated by
them.    And we would not fail in discerning "the plain distinction
between the exercise of legislative power in framing and enacting
laws, and the exercise of an altogether different and foreign but
subordinate power in producing the event or result upon which
such enactment is to take effect," the distinction being as evident
as that between a conditional judgment and a judgment which is
to take effect according as the electors may decide.    The principle
that the legislature cannot delegate its legislative authority has
been relied upon in numerous cases, and it has almost as frequently
been decided that in the enactment then before the court there
had not been such a delegation.    But what, then, was the nature
of these enactments?

First, we will consider that class of cases where the legislature
has passed an act incorporating a city or village, or dividing a
county, or amending a city charter, or removing a county-seat,
provided it should not take effect unless the electors adopted its
provisions.    In *Paterson* v. *Society*, 4 Zab. 385, where the legis-
lature, having incorporated the city of Paterson, provided that the
act should not go into effect unless assented to by a majority of
the electors of the township of Paterson, it was urged that this act
was unconstitutional as being a delegation of legislative authority.
*Green*, C. J., in delivering the opinion of the court, says,—" It is
conceded as indisputable,—I. That as well by the fundamental
theory of a representative democracy as by the express provision
of the constitutions of the states of the Union, legislation cannot
be exercised directly by the people. II. That the legislative power
cannot be delegated; that it can only be exercised by the function-
aries and in the mode designated and prescribed in the constitution.
III. That a law enacted by any other authority, or in any other
mode than that prescribed by the constitution, is void. . . .
The question submitted by the act to the inhabitants of the dis-
trict was submitted to them not as a part of the sovereign people,
but simply as corporators.    Nor was the question upon the expedi-
ency of the statute or of any particular provision of the charter,
but simply whether they would accept the charter tendered to

them by the legislature. Their vote was an act of acceptance, not of legislation. . . . The acceptance of a charter by the vote of a municipal corporation is no more an act of legislation than the acceptance of a charter by the votes of the members of a private corporation." In *People* v. *Reynolds*, 5 Gil. 1, the legislature had authorized the division of Gallatin county, subject to the approval of a majority of the voters, and it was objected that this act was a delegation of legislative authority. But *Caton*, J., in delivering the opinion of the court, says,—"A law may depend upon a future event or contingency for its taking effect, and that contingency may arise from the voluntary act of others. Of this class are all laws creating private corporations, and a very large proportion of the laws creating public or municipal corporations. . . . All such laws are perfect and complete when they leave the hands of the legislature, although a future event shall determine whether they can take effect or not. . . . The legislature may grant ferry licenses, or it may lay out roads, and specify their routes and bounds; and yet who will doubt that it may delegate this power to others, either by general or special laws? So, also, it may pass the laws réquisite for the government of a particular city, or township, or school-district; and who will doubt the propriety of its authorizing this to be done by the people within the limits of the city, town, or district, by their local representatives, or even directly?" In *Commonwealth* v. *Quarter-Sessions*, 8 Penn. St. 391, a new township had been erected out of a portion of an old township, and the legislature directed an election to be held to determine whether the new township should be continued or annulled. *Bell*, J., in delivering the opinion of the court, says,—"The erection of a township or the creation of a new district for merely municipal purposes, or convenience in the transaction of the public business, is in no degree similar to the exercise of the law-making power. The one is an exercise of sovereignty; the other, in its very nature, a subordinate function. The latter, like the laying out of a public road or highway, or the erection of a bridge, may require the exercise of judgment and ability; but there is nothing either in the positive provisions of our constitutions, or the genius of our institutions, which prohibits the action of other than legislative bodies. . . . It has never been imagined that it bore any resemblance to the power of enacting laws." In *Stone* v. *Charlestown*, 114 Mass. 214, another case where a statute uniting certain municipalities was not to take effect unless accepted by the voters of the respective municipalities, *Gray*, C. J., in delivering the opinion of the court, says,—"The power to alter the boundaries of counties, towns, and cities . . . is an inherent attribute of the legislature, to be exercised according to its own views of public expediency, unless restrained by constitutional provision." In *Chandler* v. *Boston*, 112 Mass. 200, where a similar question arose, *Colt*, J., in delivering the opinion of the court, says,—"The con-

trol of the general court over territorial divisions of the state into cities, towns, and districts, unless controlled by some specific constitutional limitation, must necessarily be supreme. It is incident to that sovereign power which regulates the performance of public and political duties." See, also, *Smith* v. *McCarthy*, 56 Penn. St. 359; *Commonwealth* v. *Painter*, 10 Penn. St. 214; *State* v. *Scott*, 17 Mo. 521; *People* v. *Nally*, 49 Cal. 478; *Morford* v. *Unger*, 8 Iowa 82; *Corning* v. *Greene*, 23 Barb. 33; *Bank of Chenango* v. *Brown*, 26 N. Y. 467.

From these authorities it appears that acts of this nature do not derive their validity from the power delegated to the legislature to make laws, but from that power of sovereignty which is inherent in the legislature.

Upon the same principle are those acts sustained wherein the legislature has made the assessment of a tax depend upon the votes of the electors, and they include those cases where the electors have voted to subscribe to a railroad, or to erect a separate free-school system, or to establish a park, or some other public work. In *C. W. & Z. R. R.* v. *Com'rs*, 1 Ohio St. 77, the legislature authorized the commissioners to subscribe to the capital stock of the plaintiff company, and to issue bonds of the county, or to borrow the money wherewith to make the subscription good, and empowered them to levy a tax annually to create a sinking-fund to meet the obligations, but provided that the question of subscription was to be submitted to the electors of the county. It was objected that the act was unconstitutional, as being a delegation of legislative authority; but *Ranney*, J., in delivering the opinion of the court, after recognizing the principle that legislative authority could not be delegated, continued,—"But while this is so plain as to be admitted, we think it equally undeniable that the complete exercise of legislative power by the general assembly does not necessarily require the act to so apply its provisions to the subject-matter as to compel their employment without the intervening assent of other persons, or to prevent their taking effect only upon the performance of conditions expressed in the law. Thus, county commissioners are authorized, but not required, to erect public buildings, and to erect and establish poor-houses, and to levy taxes for these purposes. The school laws of this state have always allowed householders and resident tax-payers of school-districts to determine, by vote, upon the erection of school-houses and the imposition of the necessary taxes for the purpose. Of the same character is the law which leaves to the citizens of each township to decide upon the erection of a town-house—while every act of incorporation ever passed necessarily refers the question of its acceptance to the corporators—these all present cases where the discretion is left to the body of those interested or to be affected." In *People* v. *Saloman*, 51 Ill. 37, the legislature provided for the establishment of a park, and the assessment of a tax (to be levied

with other taxes) for the maintenance of the same, but made the entire scheme to depend upon the votes of the electors in the towns wherein the park was situated. The same objection being taken, *Breese*, C. J., delivering the opinion of the court, says,— "If the legislature has power, for any purpose they may deem beneficial, to abstract from the powers they have granted to a municipal corporation and to curtail their territorial jurisdiction, what reason can be urged why they should not, with the assent of the people to be affected by the measure, place over them an authority for a special purpose with the powers granted to the relators?" The statute is accordingly held constitutional, as within *People* v. *Reynolds, supra.* In *State* v. *O'Neill*, 24 Wis. 149, where the legislature had established a board of public works in Milwaukee, but provided it should be void unless accepted by a majority of the electors, *Cole*, J., in delivering the opinion of the court, says,—"This is a complete enactment in itself; it requires nothing to perfect it as a law; while it is only left to the people to be affected by it to determine whether they will avail themselves of its provisions. The legislature may refer questions of local government, including police regulations, to the local authorities." See, also, *Lafayette R. R.* v. *Geiger*, 34 Ind. 185; *Alcorn* v. *Hamer*, 38 Miss. 652; *Bull* v. *Read*, 13 Grat. 78; *State* v. *Wilcox*, 45 Mo. 458; *Hudson Co.* v. *State*, 4 Zab. 718; *State* v. *Linn Co. Court*, 44 Mo. 504; *Hobart* v. *Supervisors*, 17 Cal. 23; *Bank of Rome* v. *Village*, 18 N. Y. 38; *Clarke* v. *Rochester*, 28 N. Y. 605; *State* v. *Tryon*, 39 Conn. 183. And the same principle applies although the statute authorizes a general tax, and submits the question as to its adoption to the electors throughout the state. *Smith* v. *Janesville*, 26 Wis. 291.

It is said in *State* v. *O'Neill, supra,* that the legislature may refer "police regulations" to the local authorities. What are these police regulations that apparently fall within this principle, that they do not derive their validity from the law-making authority, but from that sovereign authority inherent in the legislature? In *Pierce* v. *The State*, 13 N. H. 536 (1843), *Parker*, C. J., says,—"It [this police power] has relation to the peace, security, and happiness of the community, and may provide for the prevention and punishment of offences, the prevention of pauperism and idle and dissolute habits, the preservation and promotion of industry and economy, health and morals," and it would apparently embrace the regulation of the sale of ardent spirits, and the use of firearms, gunpowder, fire-crackers, the observance of the Sabbath, and quarantine rules. And it is upon this principle that in *State* v. *Noyes*, 30 N. H 279 (1855), an act of the legislature regulating the use of bowling-alleys, but which was to take effect in those towns only which should adopt its provisions, was held constitutional. *Bell*, J., in delivering the opinion of the court, says,—"It seems to be generally conceded that powers of local legislation may be granted to cities, towns, and other municipal corporations. If the legislature

can confer the power of local legislation upon such municipalities, they certainly can leave the provisions of an act drafted by themselves to their adoption or acceptance."

It is also upon this doctrine of "police regulations" that the "local option" acts can be supported, if at all. There has been much diversity of opinion upon the validity of those enactments which have allowed the electors in the several municipalities to determine by vote whether the license laws should be enforced or not, the earlier decisions being strongly opposed to the validity of such acts as being a delegation of legislative authority; but it would seem that the better opinion is that they are valid as coming within "police regulations," and not coming within the prohibition of a delegated legislative authority. In *State* v. *Morris Co.,* 7 Vroom 72, the legislature had provided that from the passage of the act persons should not sell liquor without license, but allowed the electors in the different towns to determine whether licenses should be granted or not. *Van Sykel*, J., in delivering the opinion of the court, says,—"The right of the legislature to grant the power of local government to municipalities is conceded. Under authority to establish police regulations, municipal corporations may be invested with power to make ordinances to promote the health and contribute to the safety of the community. It would not be pretended that authority could be delegated to the corporate body to pronounce how real estate should descend, or personal property be distributed, within the city limits." In *Locke's Appeal*, 72 Penn. St. 491, the act in question made the granting of licenses in a certain ward of Philadelphia depend upon a majority vote of the electors. *Agnew*, J., in delivering the opinion of the court, after admitting that the legislature stands in the relation of agent to the people, and cannot delegate its authority, continues,—"But it is perfectly clear that this law was not made, pronounced, or ratified by the people, and the majority vote is but an ascertainment of the public sentiment, the expression of the general opinion, which, as a fact, the legislature have made the contingency on which the law shall operate. . . . The wit of man cannot draw a well grounded distinction between the result of a vote upon license in a township and the result of a vote upon the existence of a township, and the removal of a court-house, or a subscription to stock, or the consolidation of an outlying district with a city. . . . The law did not spring from the vote, but the vote sprang from the law, and the law alone declared the consequences to flow from the vote." See, also, *Com.* v. *Bennett*, 108 Mass. 27; *Gloversville* v. *Howell*, 70 N. Y. 287.

But in addition to the authorities already cited, and which may be classified as those conferring municipal regulations, there are others which, though illustrating the same principle, must be differently classified. For instance, it has been decided that congress did not delegate any legislative authority when it authorized the

president to call forth the militia, and to specify the period for which the services were required, although the constitution expressly vested the regulation of the army in that body. *In re Griner*, 16 Wis. 423. Neither was it considered a delegation of legislative authority when congress authorized the president to suspend the writ of *habeas corpus*. *In re Oliver*, 17 Wis. 681. Nor was there a delegation of legislative authority when congress empowered the United States courts to frame rules regulating its practice. *Wayman* v. *Southard*, 10 Wheat. 1.

And, to take another illustration, it is not considered a delegation of legislative authority for the legislature to allow a corporation to exercise the right of eminent domain. Other illustrations might be cited, but it must be clear, from the authorities we have reviewed at length, that all acts of the legislature are not legislative acts; or, in other words, that the power to make laws is not the only power which the legislature can exercise. What, then, is this power which the legislatures have, and upon what principle is it based, since it is so different from the power to make laws, and may be entrusted to others to execute? It will be found, we submit, that the courts have allowed what we have designated as municipal legislation, upon the theory that acts of this kind are of the same nature as acts incorporating private corporations, which are made to depend upon the assent or acceptance of those to be affected. *Paterson* v. *Society, supra; People* v. *Reynolds, supra; C. W. & Z. R. R.* v. *Com'rs, supra.* And it is upon a similar ground that acts authorizing taxation, subject to the approval of the electors, and those acts granting police regulations upon a like approval, have been sustained. And it seems that the militia law and the court regulations and the right to suspend the writ of *habeas corpus* are based upon the same principle, namely, that they do not derive their validity from the legislative power delegated to the legislature, but upon the sovereign power inherent in the legislature. All corporations, both private and public, are created by virtue of the sovereign power. 1 Kyd Corp. 41. The right of eminent domain is likewise inherent in the legislature, and is not conferred, but limited, by the constitution (2 Dillon Mun. Corp., *s.* 590), both the power of eminent domain and the power of taxation being essentially powers of sovereignty. *Brewster* v. *Hough*, 10 N. H. 138. And the state constitutions (with few exceptions) do not confer this power of taxation, as it is an inherent right of the governing body. Blackwell, Tax-titles, 2. The power also to regulate the health, morality, and welfare of the community (by police regulations) is an attribute of sovereignty inherent in the legislatures. *Com.* v. *Bennett, supra.* In other words, those acts which, as we have seen, can be made to depend upon the approval of a third person, are acts which arise from the power of sovereignty inherent in the legislatures, being necessary for the purposes of government; and of these powers a delegation cannot be predi-

cated, and a grant thereof is sustained upon the principle *qui facit per alium facit per se.* But the power to enact laws belongs to the people, and having delegated this power to the legislature, and having confided in the wisdom, integrity, and discretion of their agents, it cannot be used except as authorized by the instrument creating the agency. Therefore the legislature could not enact a law concerning the descent of real or personal property, the statute of frauds, or the statute of limitations, or the rules of evidence, or any of the rules of the commercial law, and allow the people to say whether such provision should become a law. Neither can the legislature delegate to a third person, or a collection of persons, the right to determine whether a certain provision shall be or become a law or not, nor whether a given law shall or shall not be repealed.

But the doctrine contended for does not rest alone upon a theory, nor is it a mere abstract principle; but it was recognized by *Marshall*, C. J., who, in the action of *Wayman* v. *Southard, supra,* wherein it was objected that the act whereby congress permitted the U. S. courts to regulate their practice was unconstitutional, since it was a delegation of legislative authority, in delivering the opinion of the court, says,—"It will not be contended that congress can delegate to the courts, or to any other tribunal, powers which are strictly and exclusively legislative;" and it has been repeatedly upheld, even in those decisions where its application to the particular act before the court has been denied. *C. W. & Z. R. R.* v. *Com'rs, supra; Paterson* v. *Society, supra; State* v. *Beneke,* 9 Iowa 203; *State* v. *Weir,* 33 Iowa 134; *Barto* v. *Himrod,* 8 N. Y. 489; *Rice* v. *Foster, supra; Locke's Appeal, supra; Willis* v. *Owen,* 43 Tex. 41; *Roos* v. *Swenson,* 6 Minn. 428.

But we are not confined solely to those cases where, the principle being admitted, its application was denied; but there are some authorities of an affirmative nature. In *Slinger* v. *Henneman,* 38 Wis. 504, which was an action to recover for injuries inflicted by a dog, the question in dispute was whether the plaintiff could recover without alleging and proving a *scienter.* *Lyon*, J., in delivering the opinion of the court, says,—"At common law the defendant would not be liable without he were aware of the ferocious or vicious nature of his dog; and this rule is still in practice, unless changed by some statute. The only statute upon the question is known as the "dog law," and it, among other things, provides that the owner of any dog shall be liable without proving notice. In another section it is left with the county board of supervisors to determine whether the county should be exempt or not from this law. It is a settled maxim of constitutional law that the power to make laws, conferred upon the legislature, cannot be delegated by that department to any other body or authority. Yet it is undoubtedly true that in matters purely local and municipal the legislature may enact conditional laws, and refer them to the

people or proper municipal authorities to decide whether such laws shall or shall not have force and effect in their respective municipalities. Section 8, however, does not relate to municipal affairs, but it seeks to change a rule of the common law pertaining to a matter of general interest. As well might the legislature authorize the board of supervisors of a county to abolish in such county days of grace on commercial paper, or to suspend the operation of the statute of limitations. Such legislation is clearly within the restriction on the power of the legislature to delegate its authority, and is, therefore, inoperative and void."

And in *State* v. *Field*, 17 Mo. 529, a statute concerning roads and highways, certain sections of which imposed penalties and provided for their recovery by indictment, authorizing county courts in their discretion to suspend for any specified length of time the operation thereof, and to bring into force a prior statute upon the same subject, was held unconstitutional. *Gambel*, J., in delivering the opinion of the court, says,—"This act, by its own provisions, repeals the inconsistent provisions of a former act, and yet it is left to the county court to say which act shall be in force in their county. The question which is to be passed upon by the county court is whether the new act shall be suspended and the old act revived, and if so, for how long." This bears a very strong resemblance to the exercise of legislative power by the county court. Therefore it was held unconstitutional.

In *State* v. *Young*, 29 Minn. 474, 551, the constitution of Minnesota provided that no law levying a tax, or making other provision for the payment of the bonds denominated Minnesota state railroad bonds, shall take effect or be in force until such law shall have been submitted to a vote of the people of the state, and adopted by the majority of the electors of the state voting upon the same. Subsequently the legislature passed an act to provide for taking up these bonds. Section 4 of this act proposes the issue of the new bonds without submission to the vote of the people, and section 5 proposes it to be submitted to the vote of the people; and, in effect, it is left to certain judges of the district court to determine whether the legislature have power, without submitting it to the people, to make the contemplated adjustment. *Gilfillan*, C. J., in delivering the opinion of the court, says,—"It is a principle not questioned that, except where authorized by the constitution, as in respect to municipalities, the legislature cannot delegate legislative power,—cannot confer on any body or person the power to determine what shall be the law. The legislature only must determine what it shall be. The courts only must authoritatively determine what it is. . . . We regard the act as not only bad in principle, but dangerous as a precedent. If the legislature may submit to others this provision in the constitution as affecting its legislative authority, and make the taking effect of the law depend on the decision, it may, in like manner, refer any other constitu-

tional provision; and as there is nothing to restrain the legislature in its choice of the persons to whose decision it will refer such matters, it may make the reference to any person or persons, without regard to their fitness or qualifications to determine the questions submitted. The fact that their choice happened to fall upon five persons who are judges, inasmuch as the submission is not made to them as a court, and in a judicial manner, cannot affect the right to submit. The selection and reference would be as valid had it fallen upon any other five men. The evils which might grow out of a power in the legislature to thus evade the responsibility of determining its authority to pass laws, or the expediency of passing them, to shift such responsibility to any one it might choose to designate, must be apparent. The act delegates to the judges the power to determine what provisions in it shall be law, —a power which the legislature itself must exercise, and cannot delegate. It is, therefore, void."

The act in question provides for the regulation of the power of voting in corporations. It derives its validity either from the delegated law-making power, or from the power of government inherent in the legislature. It would seem that it was not intended as a politico-governmental regulation, as, for instance, a police regulation, and does not depend upon that absolute authority which the legislature has over public corporations to create, change, and destroy them at pleasure (*Berlin* v. *Gorham*, 34 N. H. 266), but that it was intended as a rule affecting the property and rights of the stockholders in corporations. It seems to be identical with a law which should regulate the transfer of stock in corporations, and this would be as much a law as the laws controlling the recording of deeds, concerning the transfer of real or personal estate; in short, it is a law. But there is one other principle which is deducible from the decisions cited, and it is this,—that although the legislative body may cause a provision to depend upon the votes of electors, yet, nevertheless, in every case it is made to depend upon the votes of those interested, and to be affected thereby. It can hardly be conceived that in the cases cited the enactments would have been sustained had they been made to depend upon the votes of persons not interested: for instance, would those enactments have been sustained wherein a tax was authorized, provided it met the approval of the electors to be affected, had it been made to depend upon the votes of the electors in another county? Would the police regulation mentioned in *State* v. *Noyes* have been sustained, had it been made binding in one town, provided another town should so vote? If this provision is not a law, but is, on the contrary, a grant of a privilege, and derives its authority not from the law-making power, but from the power of sovereignty inherent in the legislature, it must be regulated by those rules which regulate matters of like nature. If it is a grant of a private nature, it must be regulated by that rule which says that no private benefits,

with their attendant obligations, shall be imposed upon one unless with his consent. Angell & Ames Corp., *s.* 81, and cases cited. Therefore this provision is unconstitutional, since it imposes upon corporations the minority law provided the sense of the electors in the state should be in favor thereof.

Nor will section 1 of this act be sustained, should it be decided that the other sections constituted a delegation of legislative power, unless the court is satisfied that the legislature would have enacted such portion alone had it foreseen that the court would declare the remainder of the act void. *Slinger* v. *Henneman, supra.*

DOE, C. J. A municipal " corporation is properly an investing the people of the place with the local government thereof." *Cuddon* v. *Eastwick,* 1 Salk. 192, 193. " This latter description is the most appropriate, and is justified by the history of these institutions, and the nature of the powers with which they were and are invested. The forming of cities into communities, corporations, or bodies politic, and granting them the privileges of municipal jurisdiction, contributed more than any other cause to introduce regular government, police, and arts, and to diffuse them throughout Europe. Some of the cities assumed the necessary privileges, and formed themselves into bodies politic under a government established by common consent. Others purchased them from their superiors, or acquired them gratuitously from the generosity of the prince, and to enable him to counterbalance the powers of the aristocracy. The feudal government had degenerated into a system of oppression, and the great body of the people were subjected by the power of princes or superior lords to the most degrading and intolerable servitude. Many of the English charters incorporating cities and towns were likewise acquired by means of an appeal either to the fears, avarice, necessities, or generosity of the crown, and, like those on the continent, are to be viewed, as they in truth are, in the nature of a bill of rights. It was the acquisition of so much liberty conceded by, or extorted from, a sovereign claiming nearly absolute power; and hence the idea of inviolability so generally and justly attached to them. They were constitutional charters, which the crown could not encroach upon without violating the freedom of the subject." *People* v. *Morris,* 13 Wend. 325, 334. Of New York municipalities, the court in that case say (*pp.* 330, 331),—" The powers delegated within the bounds of each, executive, legislative, and judicial, and the rights vested in the inhabitants or respective corporate bodies, are of the same kind, and designed to accomplish the same end, to wit, the good government of the place." "All our thoughts and notions of civil government are inseparably associated with counties, cities, and towns. . . . Here have been the seats of modern civilization, the nurseries of public spirit, and the centres of constitutional liberty. They are the opposites of those systems which collect all

power at a common centre." *Brown*, J., in *People* v. *Draper*, 15 N. Y. 532, 562.

"In contradistinction to those governments where power is concentrated in one man, or one or more bodies of men, whose supervision and active control extend to all the objects of government within the territorial limits of the state, the American system is one of complete decentralization, the primary and vital idea of which is that local affairs shall be managed by local authorities, and general affairs only by the central authority. It was under the control of this idea that a national constitution was formed, under which the states, while yielding to the national government complete and exclusive jurisdiction over external affairs, conferred upon it such powers only, in regard to matters of internal regulation, as seemed to be essential to national union, strength, and harmony. . . . It is this also that impels the several states, as if by common arrangement, to subdivide their territory into counties, towns, road and school-districts, and to confer upon each the powers of local legislation. . . . The system is one which almost seems a part of the very nature of the race to which we belong. A similar subdivision of the realm for the purposes of municipal government has existed in England from the earliest ages; and in America, the first settlers, as if instinctively, adopted it in their frame of government, and no other has ever supplanted it, or even found advocates. In most of the colonies the central power created and provided for the organization of the towns; in one, at least, the towns preceded and created the central authority; but in all the final result was substantially the same, that towns, villages, boroughs, cities, and counties exercised the powers of local government, and the colony or state the powers of a more general nature.

"The several state constitutions have been framed with this system in view, and the delegations of power which they make, and the express and implied restraints which they impose thereupon, can only be correctly understood and construed by keeping in view its present existence and anticipated continuance. There are few of the general rules of constitutional law that are not more or less affected by the fact that the powers of government are not concentrated in one body of men, but are carefully distributed with a view to being exercised with intelligence, economy, and facility, and, as far as possible, by the persons most directly and immediately interested.

"It has already been seen that the legislature cannot delegate its power to make laws; but fundamental as this maxim is, it is so qualified by the customs of our race, and by other maxims which regard local government, that the right of the legislature, in the entire absence of authorization or prohibition, to create towns and other inferior municipal organizations, and to confer upon them the powers of local government, and especially of local

taxation and police, regulation usual with such corporations, would always pass unchallenged. . . . The municipalities . . . are governments of enumerated powers acting by a delegated authority." Cooley Const. Lim. 189–192. "Immemorial custom, which tacitly or expressly has been incorporated in the several state constitutions, has made these organizations a necessary part of the general machinery of state government, and they are allowed large authority in matters of local government, and to a considerable extent are permitted to make the local laws." Cooley Taxation (2d ed.) 63.

In *People* v. *Hurlbut*, 24 Mich. 44, Judge *Cooley* says,—" The question . . . can be nothing short of this, Whether local self-government in this state is or is not a mere privilege, conceded by the legislature in its discretion, and which may be withdrawn at any time at pleasure. . . . It must be conceded that the judicial decisions and law writers generally assert that the state creates the municipal bodies, endows them with such of the functions of corporate life, and intrusts them with such share in the local government, as to the legislative judgment shall seem best; that it controls and regulates their action while they exist, subjects them to such changes as public policy may dictate, and abolishes them at discretion; in short, that the corporate entities are mere agencies which the state employs for the convenience of government, clothing them for the time being with a portion of its sovereignty, but recalling the whole or any part thereof whenever the necessity or usefulness of the delegation is no longer apparent. This I understand to be the accepted theory of state constitutional law as regards the municipal governments. . . . But such maxims of government are very seldom true in anything more than a general sense: they never are and never can be literally accepted in practice. . . .

" The implied restrictions upon the power of the legislature, as regards local government, though their limits may not be so plainly defined as express provisions might have made them, are nevertheless equally imperative in character. . . . The circumstances from which these implications arise are,—*first*, that the constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, *second*, that the liberties of the people have generally been supposed to spring from, and be dependent upon, that system.

" De Tocqueville speaks of our system of local government as *the American system*, and contrasts it forcibly with the French idea of centralization, under the influence of which constitutional freedom has hitherto proved impossible. Democracy in America, *c.* 5. Leiber makes the same comparison, and shows that a cen-

tralized government, though by representatives freely chosen, must be despotic, as any other form of centralization necessarily is. . . . The writer first named, speaking of the New England township government, whose system we have followed in the main, says,—'In this part of the Union the impulsion of political activity was given in the townships; and it may almost be said that each of them originally formed an independent nation. When the kings of England asserted their supremacy, they were contented to assume the central power of the state. The townships of New England remained as they were before; and although they are now subject to the state, they were at first scarcely dependent upon it. . . . Among the inhabitants of New England I believe that not a man is to be found who would acknowledge that the state has any right to interfere in their local interests.' The historical fact is, that local governments universally, in this country, were either simultaneous with or preceded the more central authority. . . . The local governments, however, were less complete in the states further south; and this with some of their leading statesmen was a source of regret. Mr. Jefferson, writing to Governor Tyler in 1810, speaks of the two great measures which he has at heart, one of which is the division of counties into hundreds. 'These little republics,' he says, 'would be the main strength of the great one. We owe to them the vigor given to our Revolution, in its commencement, in the Eastern states. . . . Could I once see this, I should consider it as the dawn of the salvation of the republic.' Jefferson's Works, vol. 5, *p.* 525. The state may mould local institutions according to its views of policy or expediency; but local government is matter of absolute right, and the state cannot take it away. . . . The right in the state is a right, not to run and operate the machinery of local government, but to provide for and put it in motion. . . . When the state reaches out, and draws to itself and appropriates the powers which from time immemorial have been locally possessed and exercised, and introduces into its legislation the centralizing ideas of continental Europe, under which despotism, whether of monarch or commune, alone has flourished, we seem forced back upon, and compelled to take up and defend, the plainest and most primary axioms of free government." To the same effect is *People v. Albertson,* 55 N. Y. 50.

"The fundamental idea of a municipal corporation proper, both in England and in this country," says Dillon, "is to invest compact or dense populations with the power of local self-government. . . . In general, all of our American cities, towns, and counties are public corporations, full or *quasi.* They are created by the legislature, and are usually endowed with power to decide and control local and subordinate matters pertaining to their respective localities. The number and freedom of these local organizations, whereby political power is conferred upon the citizens of the vari-

ous local subdivisions of a state, who have a right to vote and to regulate their own domestic concerns, constitute a marked feature in our free system of government. In general, each road-district, each school-district, each city, and each county is, as to its local concerns, self-governed. . . . The policy of creating local public and municipal corporations, for the management of matters of local concern, runs back to an early period in our colonial history, is exhibited in all our legislation, and expressly or impliedly guaranteed in our state constitutions. The elective franchise in these 'local republics' is not, as was the case until recently in England, a privilege dependent upon custom or usage, or confined to certain classes, but is uniform and universal, extending to all of the adult male citizens. . . . The effect of this policy of establishing cities, towns, and districts of country into bodies politic, and investing the citizens thereof with the power of self-government, has, upon the whole, been most happy. It has been noticed by Chancellor Kent that one of the most philosophical and fair of foreign observers was much struck with the institutions of New England towns, and considered them as small, independent republics in all matters of local concern, and as forming the principle of the life of American liberty existing at this day. . . . 'Local assemblies of citizens constitute the strength of free nations. Municipal institutions are to liberty what primary schools are to science: they bring it within the people's reach; they teach men how to use and how to enjoy it. A nation may establish a system of free government, but without the spirit of municipal institutions it cannot have the spirit of liberty.' M. de Tocqueville's Democracy in America, *c.* V. . . . 'It is most convenient that the local establishments and police should be sustained in that manner; and, indeed, to the interest taken in them by the inhabitants of the particular districts, and the information upon law and public matters generally thereby diffused through the body of the people, has been attributed by profound thinkers much of that spirit of liberty and capacity for self-government, through representatives, which has been so conspicuous in the mother country, and which so eminently distinguishes the people of America.' *Per Ruffin*, J., in *Caldwell* v. *Justices*, 4 Jones (N. C.) Eq. 323.

"The value of our system of municipal institutions . . . may be seen on comparing the political condition of the people of the United States with that of the people of modern France,—selected as a fair example of a government without municipal freedom. France is a highly centralized government. The state there is everything,—the people, nothing. Municipal institutions, with a democratic element, or with the power of independent local self-government, belong there to the past. The central power governs and regulates everything. It provides amusements, constructs roads, bridges, internal improvements, controls trade, inspects manufactures." After a quoted statement of some of the evils of this

system, the author proceeds: "Such are the withering effects of a centralized despotism. How different with the decentralized system of government in the United States, where each local constituency chooses its own officers,—each road-district, school-district, village, town, city, and county administers its own affairs by the people and for the people. . . . We may therefore define a municipal corporation to be the incorporation, by the authority of the government, of the inhabitants of a particular place or district, and authorizing them in their corporate capacity to exercise subordinate specified powers of legislation and regulation with respect to their local and internal concerns. This power of local government is the distinguishing feature of a municipal corporation proper. . . .

"The New England town affords, perhaps, an example of as pure a democracy as anywhere exists. All of the qualified inhabitants meet, and directly act upon and manage, or direct the management of, their own local concerns. This form of government was adopted at a very early period, and is firmly adhered to and deeply cherished by the people of the New England states. The result has demonstrated how well adapted it is to promote the well-being of the communities that for so long a space of time have thus governed themselves. . . . In the course of time, many of the towns, or portions thereof, grew to be large and populous, and the system of meetings of the electors in their original capacity became inconvenient and almost impracticable. When the population of a town or place exceeds 10,000 or 12,000 persons, the need of the representative system is urgently felt. Accordingly, in the New England states, there are now, in addition to towns, a large number of incorporated cities, with charters or constituent statutes, organized upon the usual representative model, with a legislative or governing body, and an executive head, and subordinate officers. . . . Permitting the voters of a municipality to decide upon questions of local interest or expediency . . . seems to the author to be conformable to those ideas of self-government and self-regulation by the people concerned which lie at the basis not only of our municipalities, but of our institutions. . . . It is one of the distinguishing features of our municipal institutions that local rates shall be locally imposed by those who have to pay them or bear their burden; and this power, from very early periods, has in the different states been constantly delegated to and exercised by the local authorities. . . . The legislature may confer the taxing power upon municipalities." Dillon Mun. Corp., ss. 183, 9, 10, 12, 19, 20, 28, 44, 739, 740.

"It seems to be generally conceded that powers of local legislation may be granted to cities, towns, and other municipal corporations. And it would require strong reasons to satisfy us that it could have been the design of the framers of our constitution to take from the legislature a power which has been exercised in

Europe by governments of all classes from the earliest history, and the exercise of which has probably done more to promote civilization than all other causes combined; which has been constantly exercised in every part of our country from its earliest settlement, and which has raised up among us many of our most valuable institutions. . . . No mischiefs are suggested as having resulted or being likely to result from local legislation, which could be supposed to require the prohibition to the legislature to confer such powers. . . . We are therefore unable to entertain a doubt that the legislature may rightfully confer upon the cities, towns, and other municipal corporations, the power to pass such local regulations. . . . Assuming that the legislature has the right to confer the power of local legislation upon cities and towns,— that is, the power to pass ordinances and by-laws, in such terms and with such provisions in the classes of cases to which the power extends, as they may think proper,—it seems to us hardly possible seriously to contend that the legislature may not confer the power to adopt, within such municipality, a law drawn up and framed by themselves. If they may pass a law authorizing towns to make ordinances to punish the keeping of billiard rooms, bowling alleys, and other places of gambling, they may surely pass laws to punish the same acts, subject to be adopted by the town before they can be in force in it. It is not suggested that there is any rule which forbids the making of places for gambling public nuisances, and consequently punishable like other nuisances, or which prohibits the grant of authority to towns to declare such places to be nuisances." *State* v. *Noyes*, 30 N. H. 279, 292, 293, 294. "It seems to us difficult to answer this reasoning, if it be confined to such laws as fall within the proper province of local government." Cooley Const. Lim. 124 *n*. "On many subjects, the state power of local legislation is delegated to the popular legislatures of towns and the representative legislatures of cities." And for some purposes "it is immaterial whether the power is exercised by the state legislature or by the city councils, to whom the state has delegated it." *Kelley* v. *Kennard*, 60 N. H. 1, 6. "A reason for submitting a local question to the voters in town-meeting is, that by their interest in it they are peculiarly qualified to decide it. And in many cases the more direct and exclusive their interest, the more reason there is supposed to be for delegating to them the power of legislation." *Dorchester* v. *Youngman*, 60 N. H. 385, 397, 398; Cooley Const. Lim. 118, 119. The bounds of reasonableness by which the municipal exercise of legislative power is generally limited (1 Dillon Mun. Corp., ss. 307–330) do not make the power executive or judicial, nor alter the fact that it is delegated.

In 1639, the inhabitants of Exeter, "judging themselves without the jurisdiction of Massachusetts," "combined into a separate body politic, and chose rulers and assistants, who were sworn to the due discharge of their office, and the people were as solemnly sworn to

obey them.    Their rulers were Isaac Grosse, Nicholas Needham, and Thomas Wilson, each of whom continued in office the space of a year, having two assistants.   The laws were made in a popular assembly, and formally consented to by the rulers.    Treason and rebellion against the king    .    .    .    or the country were made capital crimes; and sedition was punishable by a fine of ten pounds or otherwise, at the discretion of the court.    .    .    .    The people of Dover and Portsmouth, during all this time, had no power of government delegated from the crown; but finding the necessity of some more determinate form than they had yet enjoyed, combined themselves each into a body politic, after the example of their neighbors at Exeter."    October 22, 1640, "the inhabitants of Dover, by a written instrument signed by forty-one persons, agreed to submit to the laws of England, and such others as should be enacted by a majority of their number, until the royal pleasure should be known.    The date of the combination at Portsmouth is uncertain, their first book of records having been destroyed in 1652.    .    .    .    Four distinct governments (including one at Kittery, on the north side of the river) were now formed on the several branches of Piscataqua.    These combinations being only voluntary agreements, liable to be broken or subdivided on the first popular discontent, there could be no safety in the continuance of them.    The distractions in England at this time had cut off all hope of the royal attention, and the people of the several settlements were too much divided in their opinions to form any general plan of government which could afford a prospect of permanent utility.    The more considerate persons among them, therefore, thought it best to treat with Massachusetts about taking them under their protection.    .    .    .    The affair was more than a year in agitation, and was at length concluded," as to Portsmouth and Dover, April 14, 1641.    "The inhabitants of Exeter had hitherto continued their combination; but finding themselves comprehended within the claim of Massachusetts, and being weary of their inefficacious mode of government, they petitioned the court, and were readily admitted under their jurisdiction," September 8, 1642. Belknap Hist. N. H., *c.* 2; 1 N. H. Prov. Papers 327, 328, 332.

The written and signed "combination of the people of Dover to establish a form of government" was, "Whereas sundry mischiefs and inconveniences have befallen us, and more and greater may, in regard of want of civil government, his most gracious Majesty having settled no order for us to our knowledge: We, whose names are under written, being inhabitants upon the river Piscataqua, have voluntarily agreed to combine ourselves into a body politic, that we may the more comfortably enjoy the benefit of his Majesty's laws, together with all such laws as shall be concluded by a major part of the freemen of our society."    1 N. H Prov. Papers 126; 10 N. H. Prov. Papers 700.    The social contract written and signed at Exeter was, "We    .    .    .    brethren of the church of

Exeter . . . with other inhabitants there, considering with ourselves the holy will of God, and our own necessity, that we should not live without wholesome laws and government amongst us, of which we are altogether destitute, do . . . combine ourselves together to erect and set up amongst us such government as shall be to our best discerning, . . . binding ourselves . . . to submit ourselves to such godly and christian laws as are established in the realm of England to our best knowledge, and to all other such laws which shall upon good grounds be made and enacted amongst us." 1 N. H. Prov. Papers 132. Under this local constitution, the exercise of legislative power in town-meeting was not lacking in formality or vigor. "It is enacted for a law, constituted, made, and consented unto by the whole assembly, at the court solemnly met together in Exeter the 9 day of the 2 month, Ano. 1640, That if any person . . . shall plot or practise . . . the betraying of the country," he "shall be punished with death," and "if any person . . . shall plot or practise treachery, treason, or rebellion, or shall revile his majesty the Lord's Anointed," he "shall be punished with death." 1 N. H. Prov. Papers 140.

Since the want of government was supplied by the settlers at Exeter, Dover, and Portsmouth, the system of decentralization has accompanied the occupation of our territory. Local self-government (including much administration of law, and an extensive use of the law-making powers of taxation and police), introduced not only before the organization of both the state and province of New Hampshire, but also before the extension of Massachusetts jurisdiction to the Piscataqua, and continuing in uninterrupted operation more than two hundred and forty years, has been constitutionally established by recognition and usage. Preceding all other New Hampshire legislation, and firmly fixed in the foundation of our institutions as an executed intention of the people, the local exercise of the power of making local law is an application of the principle of self-government that retains the control of local affairs in the community most interested in them. It is a positive and operative principle that cannot be displaced by a theory of centralization constructed upon the mere negation that a law is not invalidated by being made to take effect upon a contingency. Equally impossible is it to reverse the nature of an inalienable trust, and make the entire fiduciary duty of general legislation assignable, by an application of the principle of local government to legislation that is not local.

When a father conveys his farm to his son to be held upon the express or implied condition that the latter shall maintain his parents thereon, the personal trust reposed in the grantee cannot be transferred by him to a substitute. *Flanders* v. *Lamphear*, 9 N. H. 201. For good reasons, the grantor chooses that the contract shall be a personal one, and shall not extend to the grantee's

assigns. *Eastman* v. *Batchelder*, 36 N. H. 141, 150. "There must be many contracts, the performance of which may be secured by a conveyance of land, which have such peculiarities that the provisions of law relative to mortgages can have but a very partial, if any, application to them. Among these classes, that which becomes material in this case is probably the most considerable, namely, the class of contracts for personal services; those in which one of the parties agrees that he will, in his own person, render certain services to another. In such cases, from the nature of the contract secured, the rights of one or both the parties do not admit of assignment, and the mortgage, which is but an incident to the debt, and cannot be transferred except in connection with it, is necessarily unassignable." *Bethlehem* v. *Annis*, 40 N. H. 34, 41. When land was held, under the feudal system, by vassals, upon condition of rendering certain services in their own persons, they could not assign, nor could their heirs inherit, the obligation of personal service, or the land held on such a condition. *Cole* v. *Lake Co.*, 54 N. H. 242, 285.

"An agent ordinarily, and without express authority, or a fair presumption of one, growing out of the particular transaction or the usage of trade, has not power to employ a sub-agent to do the business without the knowledge or consent of his principal. The maxim is, that *delegatus non potest delegare*, and the agency is generally a personal trust and confidence which cannot be delegated; for the principal employs the agent from the opinion which he has of his personal skill and integrity, and the latter has no right to turn his principal over to another of whom he knows nothing." 2 Kent Com. 633. "The directors of a corporation, specially empowered by the charter to contract on its behalf, have no power to appoint sub-agents to contract for the corporation. . . . Neither can an agent, appointed by the corporation, and authorized to make a particular contract, or to do a certain piece of business, delegate his trust, unless specially empowered to do so, the personal confidence of the principal in the agent being the supposed motive of the selection and appointment of the latter." Angell & Ames Corporations, s. 277. "An agent cannot delegate to another any portion of his power requiring the exercise of discretion or judgment, unless in the power conferred upon the agent is involved the power of substitution by the agent, in express terms, or, at least, by necessary implication." *Gillis* v. *Bailey*, 21 N. H. 149, 165. "All the magistrates and officers of government," legislative, executive, and judicial, are the "agents" of the people. Bill of Rights, art. 8.

Of the power to authorize the drawing of lotteries, granted to the city of Washington by its charter, the court say,—"A corporation aggregate can legislate within its prescribed limits, but can carry its laws into execution only by its agents. . . . It is a trust, and an important trust, confided to the corporation itself for

the purpose of effecting important improvements in the city, and ought therefore to be executed under the immediate authority and inspection of the corporation. . . . The power thus cautiously granted is deposited with the corporation itself without an indication that it is assignable." *Clark* v. *Washington*, 12 Wheat. 40, 53, 54. Without legislative consent a railroad company cannot alienate its public duty and responsibility by a sale or lease of its road (*Pierce* v. *Emery*, 32 N. H. 484, 504, *Richards* v. *Railroad*, 44 N. H. 127, 136, *Hall* v. *Sullivan Railroad*, 21 Law Reporter 138, 140, 141, *Y. & M. L. R. Co.* v. *Winans*, 17 How. 30, 39, *Thomas* v. *Railroad Co.*, 101 U. S. 71, 83, 84, *Abbott* v. *Horse Railroad Co.*, 80 N. Y. 27, 30), or by forming a general partnership with another company. *Burke* v. *Concord Railroad*, 61 N. H. 160.

In *Stoughton* v. *Baker*, 4 Mass. 522, 530, Loud and two others were a committee authorized by a resolution of the legislature to cause such fishways to be constructed at certain dams as in the opinion of all or the major part of them would be sufficient for the passage of shad and alewives. Of the appointment of Loud as a sub-committee, the court say,—"The authority given to the committee is, by the terms of the resolve, to be exercised by them, or the major part of them. The exercise of this authority is personal, and cannot be delegated. If it could be delegated, it might be delegated to any other man as well as to Mr. Loud, one of the committee." For the same reason, a power conferred on towns to divide their territory into convenient school-districts cannot be transferred by them to the selectmen (*School District* v. *Gilman*, 3 N. H. 168); and the same power conferred on the selectmen cannot be transferred by them to the town. *Neal* v. *Lewis*, 46 N. H. 276, 279. A town's power of selecting a railroad for the construction of which money could be raised by the town, could not be delegated to a committee. *M. Railroad* v. *Peterborough*, 49 N. H. 281. "Towns have power to raise money to defray the necessary charges of the town, but it is well settled that this is a power which cannot be transferred. It cannot be vested in a committee. *Gove* v. *Lovering*, 3 N. H. 292. Districts, too, may raise money; but their power cannot be delegated, for the same reason which limits the powers of towns." *Harris* v. *School District*, 28 N. H. 58, 63; *Hitchcock* v. *Galveston*, 96 U. S. 341, 348; Dillon Mun. Corp., ss. 96, 779.

A "very important limitation which rests upon municipal powers is that they shall be executed by the municipality itself, or by such agencies or officers as the statute has pointed out. So far as its functions are legislative, they rest in the discretion and judgment of the municipal body intrusted with them, and that body cannot refer the exercise of the power to the discretion and judgment of its subordinates or of any other authority. . . . This restriction, it will be perceived, is the same which rests upon the

legislative power of the state, and it springs from the same reasons. The people in the one case in creating the legislative department, and the legislature in the other in conferring the corporate powers, have selected the depositary of the power which they have designed should be exercised, and in confiding it to such depositary have impliedly prohibited its being exercised by any other agency. A trust created for any public purpose cannot be assignable at the will of the trustee." Cooley Const. Lim. 204, 205. "One of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the state has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed. The power to whose judgment, wisdom, and patriotism this high prerogative has been intrusted cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom, and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust." Cooley Const. Lim. 116.

An act of 1849 for the establishment of free schools in New York provided, in *ss.* 10 and 14, that "The electors shall determine by ballot at the annual election to be held in November next whether this act shall or shall not become a law," and that "In case a majority of all the votes in the state shall be cast against the new school law, this act shall be null and void; and in case a majority of all the votes in the state shall be cast for the new school law, then this act shall become a law." In an opinion holding this act invalid, the court say,—"The legislative power in this state is vested by the constitution in the senate and assembly. Art. 3, *s.* 1. The power of passing general statutes exists exclusively in the legislative bodies. In one instance only it is limited or qualified. 'No law for the contracting of a debt shall take effect until it shall at a general election have been submitted to the people, and have received a majority of all the votes cast for and against it at such election.' Art. 7, *s.* 12. In this special and single case, the people by the constitution reserved legislative power to themselves. The legislature pass the bill in the usual form of enactment, but the statute has no force or authority until it is sanctioned by a vote of the people. In substance and reality the legislature propose the law. The people pass or reject it by a general vote. This is legislation by the people.

"The exercise of this power by the people in other cases is not expressly and in terms prohibited by the constitution, but it is forbidden by necessary and unavoidable implication. The senate and assembly are the only bodies of men clothed with the power of general legislation. They possess the entire power with the exception above stated. The people reserved no part of it to them-

selves excepting in regard to laws creating public debt, and can therefore exercise it in no other case.

"The act of 1849 does not on its face purport to be a law as it came from the hands of the legislature for any other purpose than to submit to the people the question whether its provisions in relation to free schools should or should not become a law (*section* 10), and by section 14 the act was to become law only in case it should have a majority of the votes of the people in its favor. Without contradicting the express terms of the 10th and 14th sections, it cannot be said that the propositions contained in it in relation to free schools were enacted as law by the legislature. They were not law, or to become law, until they had received a majority of the votes of the people at the general election in their favor, nor unless they received such majority. It results, therefore, unavoidably from the terms of the act itself that it was the popular vote which made the law. The legislature prepared the plan or project, and submitted it to the people to be passed or rejected.

"The legislature had no power to make such submission, nor had the people the power to bind each other by acting upon it. They voluntarily surrendered that power when they adopted the constitution. The government of this state is democratic; but it is a representative democracy, and in passing general laws the people act only through their representatives in the legislature. . . .

"A valid statute may be passed to take effect upon the happening of some future event certain or uncertain. . . . The event or change of circumstances on which a law may be made to take effect must be such as in the judgment of the legislature affects the question of the expediency of the law,—an event on which the expediency of the law, in the judgment of the law-makers, depends. On this question of expediency, the legislature must exercise its own judgment definitively and finally. When a law is made to take effect upon the happening of such an event, the legislature in effect declare the law inexpedient if the event should not happen, but expedient if it should happen. They appeal to no other man or men to judge for them in relation to its present or future expediency. They exercise that power themselves, and then perform the duty which the constitution imposes upon them. But in the present case no such event or change of circumstances affecting the expediency of the law was expected to happen. The wisdom or expediency of the free-school act, abstractly considered, did not depend on the vote of the people. If it was unwise or inexpedient before that vote was taken, it was equally so afterwards. The event on which the act was made to take effect was nothing else than the vote of the people on the identical question which the constitution makes it the duty of the legislature itself to decide. The legislature has no power to make a statute dependent on such a contingency, because it would be confiding to others that legislative discretion which they are bound to exercise themselves, and

which they cannot delegate or commit to any other man or men to be exercised.

" They have no more authority to refer such a question to the whole people than to an individual. The people are sovereign, but their sovereignty must be exercised in the mode which they have pointed out in the constitution. All legislative power is derived from the people; but when the people adopted the constitution, they surrendered the power of making laws to the legislature, and imposed it upon that body as a duty. They did not reserve to themselves the power of ratifying or adopting laws proposed by the legislature, except in the single case of contracting public debt. They probably foresaw the evil consequences likely to arise from such a reservation. These are well and forcibly expressed by Mr. Justice *Johnson* in his opinion in the case of *Johnson* v. *Rich*, 9 Barb. 686. 'I regard it,' said he, 'as an unwise and unsound policy, calculated to lead to loose and improvident legislation, and to take away from the legislator all just sense of his high and enduring responsibility to his constituents and to posterity, by shifting that responsibility upon others.' . . .

" For further illustration, let us suppose that the 10th and subsequent sections of the act of 1849 had directed the attorney-general, or the archbishop of the Catholic church, or the common council of the city of New York, to certify on the next general election day whether in his or their opinion that act ought to become a law, and had further provided that the act should or should not take effect according to such certificate: it cannot be pretended that the statute would have become operative upon the making of the certificate in its favor. The constitution does not authorize the power of legislation to be so delegated. If the legislature cannot delegate to an individual the authority to determine by the mere exercise of his judgment whether a statute ought to take effect or become a law, it follows as a necessary consequence that they cannot delegate it to the whole people. The constitution has no more authorized it in the latter case than in the former. The people have limited the exercise of their own power to the modes pointed out in the constitution; and although they hold the ultimate sovereignty of the state, they are subject like other sovereigns to establish fundamental law." *Barto* v. *Himrod*, 8 N. Y. 483. In the same case, *Willard*, J., says the act "was a mere proposition submitted to the people to be adopted or rejected, as they pleased," and by this method of proposing laws "all the safeguards which the constitution has provided are broken down, and the members of the legislature are allowed to evade the responsibility which belongs to their office."

In *Clarke* v. *Rochester*, 28 N. Y. 605, 633, *Denio*, C. J., delivering the opinion, and citing *Barto* v. *Himrod* and other New York cases, says,—" The principles settled in these cases are, first, that the legislature cannot commit the power of enacting laws to any

other body than itself, not even to all the electors of the state; and that this principle cannot be evaded by a statute which shall prescribe the details of a particular legislative act, and then provides that the question whether it shall be established as law shall be determined by a vote of the electors. This was the plan resorted to in respect to the free-school act which was in question in *Barto* v. *Himrod.* It was said, with entire accuracy, as I conceive, that what was done by the legislature in that case was to propose to the people the details of a statute, and then to put it to the electors to determine whether they would or would not clothe it with the attributes of law. If it met their approval, it was to become a statute of the state; otherwise it was to be entirely void. The statute which was thus proposed, and which was approved of by the voice of the electors, was one of the most general character, affecting the whole state; and the deliberate judgment of this court was, that such statutory provisions could not be brought into existence in that manner. The government organized by the constitution was considered to be, as it undoubtedly is, that of a representative republic, and no power existed in the legislature to convert it, on any occasion, or for any purpose, into a pure democracy. The organization of the law-making power is one of the principal purposes of a constitutional charter of government, and in all communities of considerable extent this must be effected by means of a system of representation, by which the people at stated periods delegate to citizens chosen by them the power of enacting general laws, by which all the members of the state are to be governed. That purpose is expressed in the constitution of this state by the declaration that the legislative power shall be vested in the senate and assembly. Art. 3.  .  .  .  But while general statutes must be enacted by the legislature, it is plain the power to make local regulations, having the force of law in limited localities, may be committed to other bodies representing the people in their local divisions, or to the people of those districts themselves. Our whole system of local government, in cities, villages, counties, and towns, depends upon that distinction. The practice has existed from the foundation of the state, and has always been considered a prominent feature in the American system of government." In that case, a question of local legislation had been submitted to and decided by the electors of Rochester. In such a case in this state, the senate and house would not be responsible for the legislative decision they intended not to make. *M. Railroad* v. *Peterborough, supra; Perry* v. *Keene,* 56 N. H. 514, 530—*S. C.,* 58 N. H. 40; *Gloversville* v. *Howell,* 70 N. Y. 287, 291.

"Legislative power can be delegated to towns only in local town affairs." *Bowles* v. *Landaff,* 59 N. H. 164, 192. "By the constitution, legislative power is vested not in the towns, but in the senate and house of representatives. And without a well established ground of exception, the senate and house are as incapable ·

of delegating their legislative power. as the governor and council are of delegating the power of pardon, or the court of delegating the power of deciding the constitutional question raised in these cases. All power is derived from the people, and all magistrates and officers of government are their agents, and at all times accountable to them. Bill of Rights, art. 8. And these agents have not a general authority to avoid their official responsibility by relegating their duties to their assignees. If the legislative seats were filled with substitutes. it would not be claimed that a bill passed by them was law. The vote of a body of substitutes, assembled in the state-house or elsewhere, is not legislation, unless authorized by a legal construction of the constitution. . . . The grant by the people to the senate and house of the power of delegating a power of local legislation, is implied from the principle of local self-government." *Gould* v. *Raymond*, 59 N. H. 260, 276.

In the organization of the state government, for reasons by them deemed sufficient, the people vested the supreme legislative power not in themselves, but in certain agents, as a personal trust to be executed under the obligation of an official oath. By this oath, they bound each senator and representative "accepting the trust" to the support of the constitution, and the constitutional performance of his fiduciary duty. Const., art. 2, 84. They were of opinion that while there might be good reason for granting to municipalities a limited power of making local law, it was not wise to attempt to carry on the work of state legislation in town-meeting. They might have made an effort to overcome one of the difficulties of that method by authorizing a state committee to propose laws, and requiring the governor to ascertain and proclaim the result of the popular vote in the manner adopted by the act of 1879. They preferred and they established a representative republic; and they did not confer upon the legislature the power of abolishing it, repealing the second article of the constitution, and changing the supreme law-making body into a committee on proposals. That power the legislature would have if they could transfer from themselves to others the responsibility of passing or refusing to pass a law of a non-local character. If the power of general legislation could be conveyed by the act of 1879 to those who might be induced to exercise it in town-meeting, all laws could be made and repealed in the same way, and the representative character of the government could easily be extinguished. If the senate and house can transfer the powers and responsibilities of general legislation, they can select their assignee, to whom all executive and judicial functions being also conveyed by the governor, council, courts, and juries, the concentrated despotism, prohibited by the thirty-seventh article of the bill of rights (*Ashuelot R. R. Co.* v. *Elliot*, 58 N. H. 451, 452, 453), can be introduced.

The act of 1879, on which the relator's claim is based, is not a

local law. If it is a law, it is in force throughout the state: and counsel on both sides agree that the power of making it could not be delegated by the legislature. The relator's position is, that the second, third, fourth, and fifth sections were not a delegation of legislative power; and that if they were, the delegation was void, and the first section took effect, and would have taken effect, whichever way the people voted. The legal construction of the act is the ascertainment of the intention of the legislature. In one sense, their intention is a matter of law: it is a question for the court. In another sense, and for the purpose of the present inquiry, it is a matter of fact: it is to be determined by the natural weight of competent evidence. The nature of such questions, and the ground of their decision, were made clear by Judge *Ladd's* restatement of the law of interpretation in *Rice* v. *Society*, 56 N. H. 191, 197, 198, 202, 203. *Edes* v. *Boardman*, 58 N. H. 580, 592; *Burke* v. *Concord Railroad*, *ante* 160, 233. The second section of the act provides that "the sense of the voters of this state shall be taken upon section one of this act, by ballot, those in favor thereof voting 'yes,' and those opposed voting 'no.'" The fourth section provides that "the governor shall, on or before the fifteenth day of January, 1881, make proclamation of the result of said vote; and if it shall appear that a majority of the voters voting upon said proposition voted in favor thereof, then section one of this act shall go into effect, and become a law, from and after said fifteenth day of January, 1881; and otherwise shall be of no effect." This is competent and conclusive evidence of the fact that the legislature intended the first section should not "become a law" unless "a majority of the voters, voting upon said proposition, voted in favor thereof." If a majority had voted against it in the town-meetings, the power of enacting the first section would not have been intentionally exercised by the senate and house; their purpose and understanding would have been that the first section should not "become a law;" and no rule of construction could make it a law contrary to the expressed will of the legislature.

Under general authority given by the city charter of Concord (Laws 1849, *c.* 835, *s.* 17) to make by-laws and regulations, the city council passed an ordinance prohibiting the keeping of intoxicating liquors in any refreshment saloon for any purpose whatever. In *State* v. *Clark*, 28 N. H. 176, the defendant was convicted in the police court, and sentenced to pay a fine and costs, for a violation of the ordinance; and on appeal, the judgment of the police court was affirmed. It was held that the ordinance was a valid local law, enacted by the city council in the exercise of delegated power. On the same ground, an ordinance of Dover, prohibiting restaurants to be kept open after ten o'clock at night, was sustained. *State* v. *Freeman*, 38 N. H. 426. The legislative character of the municipal acts, in such cases, is affirmed in *Lisbon*

v. *Clark*, 18 N. H. 234, 238, 242, 243, and *State* v. *Ferguson*, 33 N. H. 424, 428, 429, 430, 431, 432, 433. By *c*. 245 of Laws of 1845, entitled "An act to suppress bowling alleys," it was enacted "that any bowling alley situate within twenty-five rods of any dwelling-house, store, shop, school-house, or place of public worship, shall be taken and deemed to be a public nuisance. Sec. 2. This act shall not be in force except in such towns as shall at some legal meeting adopt the same." The act was adopted by the town of Franklin. In *State* v. *Noyes*, 30 N. H. 279, the defendant was indicted and convicted for a violation of the act which (in the language of the indictment), by force of the vote in town-meeting, "became, and ever since has been, and still is, the law of said state of New Hampshire within the said town of Franklin;" and the statutory prohibition was held to be a valid local law made by the town in the exercise of delegated power. The doctrine of these decisions is too well settled in this state to be shaken by any authorities of other jurisdictions which hold in such cases either that the power is not legislative in its character, or that it is not delegated.

*P. Church* v. *City of New York*, 5 Cow. 538, 540, was an action on the defendants' covenant for quiet enjoyment of land conveyed by the defendants to the plaintiffs' grantors in 1766, for a cemetery. The alleged breach of covenant was a by-law made by the defendants in 1823, prohibiting that use of the land. The court say,—"The defendants are a corporation, and in that capacity are authorized by their charter, and by-law, to purchase and hold, sell and convey, real estate in the same manner as individuals. They are considered a person in law within the scope of their corporate powers, and are subject to the same liabilities and entitled to the same remedies for the violation of contracts as natural persons. They are also clothed, as well by their charter as by subsequent statutes of the state, with legislative powers; and in the capacity of a local legislature are particularly charged with the care of the public morals and the public health within their jurisdiction. In ascertaining their rights and liabilities as a corporation, or as an individual, we must not consider their legislative character. They had no power as a party to make a contract which should control or embarrass their legislative powers and duties. Their enactments, in their legislative capacity, are to have the same effect upon their individual acts as upon those of any other persons, or the public at large, and no other effect. The liability of the defendants, therefore, upon the covenant in question must be the same as if it had been entered into by an individual, and the effect of the by-law upon it the same as if that by-law had been an act of the state legislature. It is expressly authorized by the legislature; and whether it be their act, or an act of the local city legislature, makes no difference." "Powers are conferred upon municipal corporations for public purposes; and as their legislative pow-

ers cannot . . . be delegated, so they cannot be bargained or
bartered away." Dillon Mun. Corp., *s.* 97.

A New Hampshire town is "a municipal corporation, established
for the general purposes of government, with limited legislative
powers"—"a legislative corporation, established as a part of the
government of the country." *Fowle* v. *Alexandria*, 3 Pet. 398, 409.
An act authorizing a municipality to make "by-laws and ordinances
for the graduation and levelling of the streets," "gives a power to
legislate on the subject. . . . The power of this body to make
a contract which should so operate as to bind its legislative capac-
ities forever thereafter, and disable it from enacting a by-law
which the legislature enables it to enact, may well be questioned.
We rather think that the corporation cannot abridge its own legis-
lative power." *Goszler* v. *Georgetown*, 6 Wheat. 593, 595, 598.
That the city council of Dubuque "have legislative powers in
regard to the police of the city is admitted." *Fanning* v. *Gregoire*,
16 How. 524, 533. "A municipal corporation . . . is but a
department of the state. The legislature may give it all the pow-
ers such a being is capable of receiving, making it a miniature
state within its locality." *Barnes* v. *District of . Columbia*, 91 U.
S. 540, 544; *Murphy* v. *Webster*, 131 Mass. 482, 487. There is a
"surrender by the government to the municipality of a portion of
its sovereign power." *Conrad* v. *Ithaca*, 16 N. Y. 158, 171, *note*.
"By the repeal (of the city charter of Memphis) the legislative
powers previously possessed by the corporation . . . reverted
to the state." *Field*, J., in *Meriwether* v. *Garrett*, 102 U. S. 472,
511. "By St. 1799, *c.* 61, it was for the first time provided that
the owner of neat cattle so going at large, if prohibited by the in-
habitants of a town at any town-meeting legally held for that pur-
pose, should be subject to a penalty. . . . The legislature has
authorized towns to legislate on this subject." *Gilmore* v. *Holt*, 4
Pick. 258, 262, 264. "It is competent for the general assembly
to delegate to corporations of this character the power to enact
ordinances 'which, when authorized, have the force and effect of
laws passed by the legislature of the state within the corporate
limits.' . . . Within the sphere of their delegated powers,
municipal corporations have as absolute control as the general
assembly would have if it never had delegated such powers, and
exercised them by its own laws. ' . . . The general assembly
is a coördinate branch of the state government, and so is the law-
making power of public municipal corporations within the pre-
scribed limits." *D. M. G. Co.* v. *Des Moines*, 44 Iowa 505, 508,
509. "To accomplish, within the specified territorial limits, the
objects enumerated, the corporate authorities (of Baltimore) were
clothed with all the legislative powers which the general assembly
could have exerted." *Harrison* v. *Baltimore*, 1 Gill 264, 276.

An act authorizing the city council or the electors of Portsmouth
to vote a tax for building a free bridge half way across the Piscat-

aqua, if the existing toll-bridge should be discontinued, would be a contingent delegation of legislative power, and it would not be made valid or void by its contingent character. The delegation would be valid because the bridge would be a local public purpose, for which the city or its municipal legislature could be authorized to exercise the legislative power of taxation. If the act provided that it should "go into effect and become a law" when the legislature of Maine authorized the town of Kittery to build the east half of the bridge, and that the vote of Portsmouth should go into effect when Kittery voted to build the east half, these additional contingencies would not show a purpose to confer upon the legislature of Maine or upon the town of Kittery a power of making New Hampshire law. But a provision that "the sense of the voters of Portsmouth shall be taken upon the question of taxation, those in favor thereof voting 'yes,' and those opposed voting 'no,' and if it shall appear that a majority of the voters voting upon said proposition voted in favor thereof, then this act shall go into effect and become a law, and otherwise shall be of no effect," would be designed by the legislature and understood by the people of this state to be a grant of law-making power to the voters of Portsmouth. The fact of intended grant would be proved by the language of the act, taken in the sense in which the local option law of bowling-alleys was understood in *State* v. *Noyes, supra,* and the sense in which such terms would naturally be understood by a people not accustomed to regard their ancient system of local government as the contingent action of central authority, or to explain and defend it by imputing to the centre a responsibility at variance with historical fact and their own experience.

"Whereas particular towns have many things which concern only themselves, and the ordering their own affairs, and disposing of business in their own town: It is therefore ordered that the freemen of every town, with such others as are allowed, or the major part of them, shall have power . . . to make such laws and constitutions as may concern the welfare of their town; provided they be not of a criminal but of a prudential nature, and that their penalties exceed not twenty shillings for one offence, and that they be not repugnant to the public laws and orders of the country." Mass. Anc. Charters 195. The local power of local legislation confirmed by this order was exercised by our towns, as parts of Massachusetts, until they became a separate province; and the order was copied in the code enacted by our first provincial legislature in 1680. 1 N. H. Prov. Papers 403. By the province charter, the acts of the general assembly were in force until the king's pleasure was known on the question whether they should "receive any change or confirmation, or be totally disallowed." 1 N. H. Prov. Papers 380, 436. The king's reported disallowance of the whole code of 1680, in December, 1681 (1 N. H. Prov. Papers 408, Belknap Hist. N. H., Preface of Vol. 2), does not

tend to show by whom the people of New Hampshire have under-
stood their town laws were made. A municipal power of legisla-
tion was a principle of the common law of the province. Its limits
have been fixed by provincial and state authority, but it has always
been a substantial part of our government. In 1692, it was enacted
"That it shall and may be lawful for the selectmen of each town
within this province, or the major part of them, with the approba-
tion of one justice of the peace, to convene the freeholders of these
towns together, to consider, debate, and conclude of such things as
are necessary for the prudential affairs of their town, as often as
they shall find occasion; and they, or the major part of them, so
met, to make such orders as they shall find necessary for the pru-
dential concerns of their towns, provided the penalty of any default
made of such orders shall not exceed the sum of twenty shillings."
3 N. H. Prov. Papers 167. Acts of 1719, 1791, 1811, 1827, 1837,
and 1842 are referred to in *Lisbon* v. *Clark*, 18 N. H. 234. Liberal
grants of legislative power are made to towns and cities by Gen.
Laws, cc. 37, 48; c. 49, ss. 4, 5, 6; c. 50, s. 1; c. 53, s. 10; c. 85, s. 2;
c. 86, ss. 1, 2, 3, 24; c. 89, ss. 2, 19; c. 90, ss. 2, 4, 5; c. 91, s. 6;
and c. 176, s. 9.

The Portsmouth school law, passed July 7, 1826, provides "That
this act shall not take effect until the inhabitants of said town, at
their annual meeting for town officers in March next, or at some
other legal meeting held expressly for that purpose, shall adopt the
same by a vote of a majority of the legal voters present." An
amendment of this act, passed July 4, 1829, provides "That this
act shall not take effect until the same shall be adopted by said
town at their annual meeting for the choice of town officers in
March next." The Portsmouth act of the Revised Statutes (*c.* 74)
provides (*s.* 15) for its adoption by any town. The Somersworth
school law was not to "take effect in said district until adopted by
a vote thereof, at a meeting called for the purpose." Laws 1848,
*c.* 631, *s.* 8. The Somersworth act was "extended and made
applicable to all school-districts which may adopt said act at legal
meetings held for that purpose." Laws 1848, *c.* 718. The Concord
act was to "be in force whenever adopted by said Union School
District, in Concord, at any legal meeting thereof duly notified for
that purpose." Laws 1859, *c.* 2231, *s.* 2.

Chapter 113 of the Revised Statutes, containing the law "of
offences against the police of towns," and *c.* 114, "of police officers,"
are substantially a reënactment of the act of 1823, entitled "An
act to establish a system of police in the town of Portsmouth, and
for other purposes," the last section of which is, "That any town
or towns in this state, at their annual meeting, or at any other
meeting lawfully called for this purpose, may adopt such of the
provisions of the foregoing act as they may deem expedient and
necessary; in which case such provisions so adopted shall be con-
sidered to extend to such town or towns adopting the same, as

fully, to all intents and purposes, as to the town of Portsmouth."
Section 10 of *c.* 114, Rev. St., is, " This chapter shall be in force
in all towns which have at any legal meeting adopted its provisions,
and in all towns in which any of the provisions of an act entitled
'An act to establish a system of police in the town of Portsmouth,
and for other purposes,' passed June 23, 1823, are in force." In
the General Statutes, the law of "offences against the police of
towns" is given in *c.* 252, the seventeenth section of which is, " The
preceding sections of this chapter shall be in force in all towns
which shall, at any legal meeting, adopt its provisions, and in all
towns in which any of the provisions of *c.* 113 of the Revised
Statutes are in force." This section was repealed by *s.* 67, *c.* 1,
Laws 1868.

" There shall be in each town in this state, in which this act
may be in force, a police court. . . . This act shall be in force
in any town which shall, at any legal town-meeting called for that
purpose, by a majority of the voters present and voting thereon,
determine to adopt the same." Laws 1852, *c.* 1282, *ss.* 1, 12. In
an amendment of that chapter, it is enacted " That any town in
this state which shall have adopted, or which shall hereafter adopt,
the provisions of said act, be and they hereby are authorized and
empowered by a major vote of the legal voters in the same, present
at any meeting thereof duly notified and warned for that purpose,
and voting upon the question, to rescind any vote by which said
provisions shall have been adopted. All right to hold office by
virtue of said act or any of its provisions, or to perform the duties
thereof, shall cease and be fully determined upon the rescission of
any vote for its adoption as aforesaid." Laws 1854, *c.* 1534, *ss.* 1, 2.

"An act to establish the city of Keene" was to "become null
and void unless the town of Keene shall, at a meeting called for
that purpose, vote to adopt the same within one year from date."
Laws 1865, *c.* 4145, *s.* 19. In 1866 an amendment provided that
this act should be revived and continued in force if the town
adopted it within one year from the passage of the amendment.
Laws 1866, *c.* 4323. The town having adopted the charter in
March, 1867, "An act to enable the city of Keene to resume its
town organization" suspended the operation of the charter until,
at another annual meeting, " a majority of the legal voters of said
Keene, present and voting . . . shall vote to reaffirm and re-
adopt said city charter." Laws 1867, *c.* 10. " Towns have by
law a general power and duty to divide their territories into school
districts, and may from time to time alter the divisions that have
been made. Rev. St., *c.* 69. But this power, delegated by law,
the legislature, which is supreme on such subjects, may for good
cause resume." *School District* v. *Smart*, 18 N. H. 268, 273. An
act annexing Roxbury to Keene was to " take effect whenever a
majority of the legal voters of each of said towns, present and vot-
ing at a meeting duly warned and held for that purpose, shall

adopt the same." Laws 1868, *c.* 29, *s.* 5. The city charter of Manchester, conferring large legislative power on the city council, was to be void unless adopted by major vote at a legal town-meeting. The legislature reserved the power of amending it, with a proviso that whenever any amendment shall be made, and the voters, "at a legal meeting for that purpose, determine, by a majority of voters, to surrender this charter, they may be allowed so to do, and to adopt a town organization." Laws 1846, *c.* 384, *ss.* 14, 17, 31, 32.

By an act passed at the last session, *s.* 2 of *c.* 90, Gen. Laws, is "so amended as to read as follows: Sec. 2. Any town, by a major vote in town-meeting, or any school-district having not less than one hundred children between six and sixteen years of age therein, by vote of two thirds of the legal voters of said district at a legal meeting, may determine to establish a high school, and shall thereby be constituted a high school district; and no high school district so established shall thereafter be discontinued except by a vote of two thirds of the legal voters of said district." Laws 1881, *c.* 23. By another chapter, passed at the same session, it is enacted, in *ss.* 1 and 2, that the state shall be divided into two congressional districts, and in *s.* 3, that "Sections 1 and 2 of *c.* 33 of the General Laws of New Hampshire shall be repealed, and this act shall go into effect upon the passage by congress of an apportionment act allotting to New Hampshire two representatives in congress." Laws 1881, *c.* 96. These two statutes (*cc.* 23 and 96) are contingent. The effect of each depends upon the exercise of legislative power by persons not members of the state legislature. Such power is conveyed to towns and school-districts by *c.* 23, and is not conveyed to congress by *c.* 96.

As "a man may refuse to accept a grant, whether from the government or an individual" (*Ellis* v. *Marshall*, 2 Mass. 269, 277), the grant contained in the charter of a private corporation "is ineffectual until it is accepted by the corporators. . . . But there is no such rule in the case of public corporations of a municipal character. . . . The legislature has entire control over municipal corporations, to create, change, or destroy them at pleasure, and they are absolutely created by the act of incorporation, without the acceptance of the people, or any act on their part, unless otherwise provided by the act itself." *Berlin* v. *Gorham*, 34 N. H. 266, 275; Dillon Mun. Corp., *s.* 44. A contract may be made by a town and a toll-bridge company accepting a statute that takes effect when accepted by them. *C. Bridge Co.* v. *Lowell*, 15 Gray 106, 116. The fact that a municipal ordinance "amounts to a contract . . . by no means deprives it of its legislative character." *D. M. G. Co.* v. *Des Moines*, 44 Iowa 505, 510; 58 N. H. 623. What by-laws of a non-municipal corporation become stipulations of a contract between its members, or between it and third persons, and what difference, if any, between municipal and

other corporations, is contemplated in such statutes as Gen. Laws, c. 77, ss. 4, 5, 6, we need not now inquire. *Lisbon* v. *Clark*, 18 N. H. 234, 238, 242, 243; *Laconia* v. *Gilman*, 55 N. H. 127; *Gilman* v. *Laconia*, 55 N. H. 130, 131; *Markham* v. *Brown*, 8 N. H. 523; *Hilliard* v. *Goold*, 34 N. H. 230, 241; *Johnson* v. *C. Railroad*, 46 N. H. 213, 219; *Com.* v. *Worcester*, 3 Pick. 462, 473; *Com.* v. *Power*, 7 Met. 596, 600, 601; *Worcester* v. *E. M. Bridge Co.*, 7 Gray 457; *Heland* v. *Lowell*, 3 Allen 407; *Crocker* v. *Railroad*, 24 Conn. 249, 260, 261; *Hibbard* v. *Railroad*, 15 N. Y. 455, 458; *Marshall* v. *Ins Co.*, 27 N. H. 157, 164; *Blasdel* v. *Locke*, 52 N. H. 238, 243; 2 Kent Com. 296; Angell & Ames Corporations, c. 10; Redfield Railways, c. 6; Dillon Mun. Corp., ss. 336, 338, 409, 410.

"The power of pardoning offences . . . shall be in the governor, by and with the advice of council." Const., art. 52. Although "all power," legislative, judicial, and executive, is "derived from the people," and "all the magistrates and officers of government are their substitutes and agents, and at all times accountable to them" (Bill of Rights, art. 8), the constitutional relation of principal and agent existing between the people on the one hand, and the governor and council on the other, does not authorize the executive agents to refer an application for pardon to their principal for decision. The principal has determined that the pardoning power, vested in the governor and council, shall not be conveyed back to the grantor, in one case, or in all cases, without the grantor's consent given by an authorized alteration of the social contract, and that the executive agents shall not evade their duty and responsibility by altering the constitution at their pleasure. While the relation of principal and agent, existing between the people and the legislature, did not empower the legislative agents to alter the constitution by making voters in town-meeting referees to decide the question whether the first section of the act of 1879 should be law, that relation is evidence tending to show that the question was submitted to the voters for decision. When a proposition to buy a principal's property is formally submitted to him by his agent, and is categorically accepted or rejected by the principal, it is not understood by them that this amounts to the agent's assumption of the responsibility of making the sale or refusing to make it. By the act of 1879, the proposition that a grant should be made of a new power to minorities in the election of corporate directors, was submitted to the people by agents of the people. On the question of fact whether the agents understood they were assuming the responsibility of making the proposed grant, it is a circumstance of some significance that the body to whom they submitted the proposition was regarded by them, and by the organic law, as the sovereign principal from whom all powers of government are derived.

It might be asked, If the act of 1879 is not a transfer of the responsibility of enacting the first section, what language could the

legislature have used to express more clearly a transferring purpose? and if it is a transfer, how could they have expressed more clearly a contingent purpose to bear the entire responsibility? But the answers that might be given to either of these questions need not be examined. The case is decided by a simple and plain rule of construction. Common and familiar legislative language, naturally signifying a delegation of legislative power to voters in town-meeting, and firmly established in that meaning by long use, must be judicially understood in the sense in which it is known to be used and understood by the legislature and the entire population of the state. It is not necessary, in this case, to dissent from, or concur in, the remark of the court in *Barto* v. *Himrod*, 8 N. Y. 483, 490, that "the wisdom or expediency of the free-school act, abstractly considered, did not depend on the vote of the people. If it was unwise or inexpedient before that vote was taken, it was equally so afterwards." Whatever opinions may be entertained on such a point under the act of 1879, they do not determine the question of fact whether the legislature intended to retain and bear the responsibility of enacting the first section, or to convey that responsibility to their constituents.

Had the constitution conferred validity upon every statute made to take effect upon a contingency, the delegation of powers of municipal legislation need not have been authorized by the principle of local government; all law-making power would have been negotiable; and the personal trust of state legislation, inalienably vested in the senate and house by the constitution, could have been divested in one case and in all cases by conditional forms of enactment. But the question whether there is a contingent clause in the act of 1879 cannot be substituted for the question whether the legislature understood that the second, third, fourth, and fifth sections exonerated them from the responsibility of deciding that the first section should or should not become a law. There can be no arbitrary test for determining in what cases questions are submitted by the legislature to the people for decision, and in what cases the questions submitted are contingently decided by the senate and house. The legal meaning of this act does not differ from its actual meaning. It must be taken in the natural, ordinary, and established sense of its terms. A different construction would put upon the legislature a responsibility they did not assume, and find their intention contrary to the fact. If the fourth section had provided that "section one of this act shall go into effect and become a law" in every town where "it shall appear that a majority of the voters voting upon said proposition voted in favor thereof," it would have been understood that the question of the first section becoming a local law was submitted to each town for decision. Construed in the light of history, by the universal understanding of language ordinarily used in the submission of local questions to voters in town-meeting, the act was intended to be a delegation of

legislative power. The presumption in favor of its validity is overcome by competent evidence. Other questions have been argued, but it is not necessary to decide them.

                              *Judgment for the defendant.*

All concurred.